In the Matter of SAVANNAH, LTD. d/b/a Best Western Savannah, Debtor.

SECURITY PACIFIC CREDIT CORPORATION, Movant,

v.

SAVANNAH, LTD. d/b/a Best Western Savannah, Respondent.

Bankruptcy No. 92–42204.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Jan. 29, 1993.

Kathleen Horne (local counsel), Savannah, GA, and David A. Rabin, Atlanta, GA, for movant.

M. Tyus Butler, Jr., Savannah, GA, for respondent.

## MEMORANDUM AND ORDER ON MOTION FOR RELIEF FROM STAY OR IN THE ALTERNATIVE FOR OTHER RELIEF

LAMAR W. DAVIS, Jr., Chief Judge.

### FINDINGS OF FACT

Creditor, Security Pacific Credit Corporation ("Security Pacific"), moved for relief from stay or dismissal of the above-captioned Chapter 11 case or for conversion to Chapter 7 and the hearing was held on December 17, 1992. The facts revealed that this is the second Chapter 11 filed by this corporate debtor. In December, 1989, Debtor's obligation to the moving creditor was in default and the creditor accelerated the indebtedness. On December 27, 1989, Chapter 11 case number 89–42086, Savannah, Ltd., was filed. A consent order governing use of cash collateral was entered in March of 1990 and a hearing to consider approval of the Debtor's disclosure statement was scheduled for August 13, 1990. For several months following the August hearing the parties negotiated with one another extensively and ultimately a consent Chapter 11 plan was filed in court in January of 1991. On May 21, 1991, an order confirming the plan as consented to by the Debtor and its principal creditor, the Movant herein, was confirmed.

The plan essentially provided for monthly payments of approximately $42,000.00 to the creditor with a balloon payment in June 1992 at which time the entire principal balance of approximately $5.5 million would become due and payable. Debtor ceased making payments in April 1992 although up until that time the $42,000.00 monthly payments were made on a current basis. Because of the

default and breakdown of additional negotiations between the parties, the creditor was in the process of seeking appointment of a receiver in the Superior Court of Chatham County, Georgia, in October 1992 when the second Chapter 11, the within case, was filed.

During the pendency of the prior case the Debtor paid over $300,000.00 post-confirmation under terms of the plan and has made approximately $165,000.00 in improvements to the real·estate. Throughout the period the Debtor hoped that it would be in a position to refinance the obligation to Movant in order to obtain funds necessary to make the balloon payment which came due in June of 1992. However, the only lender it approached was Security Pacific which initially indicated some willingness to consider long-term financing. Ultimately Security Pacific suggested, without any commitment on its part, the broad outlines of a set of provisions under which it might consent to longterm refinancing. This proposal was rejected by the Debtor and both prior ·and subsequent to that rejection Debtor has taken no additional steps to obtain refinancing, believing that such loans are presently unavailable in today's market.

The creditor asserts that the filing of this case under the circumstances set forth above constitute bad faith and warrant dismissal or conversion of the case. The Debtor contends that because of changed circumstances which have occurred since the original case was· filed, this case does not constitute a bad faith filing. Debtor contends that because of current market conditions the motel operated by the Debtor is worth much less than the $5.5 million indebtedness and in fact may be in the range of two million dollars or less. Debtor contemplates that if the case is not dismissed it will be submitting a cramdown plan under which the secured lender will receive the value of the property, whatever it is determined to· be, plus interest and the difference of some $3.5 million would become a general unsecured claim.

Evidence revealed that while Debtor made its monthly payments following confirmation for a period of several months, certain provisions of the plan were not complied with. For example, approximately $60,000.00 in expenses for replacement of HVAC units in individual motel rooms were not completed. In addition, the Debtor never paid its unsecured creditors in accordance with the terms of the plan which required that all creditors would be paid one hundred cents on the dollar, together with eight percent interest, no later than May 1992. Debtor failed to deliver promissory notes to the individual creditors as called for by the plan, and instead negotiated lower payoffs with individual creditors. It ultimately paid unsecured creditors sums ranging from seventeen cents on the dollar to one hundred cents on the dollar in satisfaction of those claims. The average was approximately forty percent of the total unsecured claims.

In addition, the limited partners were to contribute $100,000.00 in new capital and the general partner was to make up any deficiency in the acquisition of new capital. In fact, limited partners contributed only $77,000.00 and the general partner contributed only $1,600.00 more thus failing to comply with that provision of the plan. The property was never listed for sale and except as noted above no applications for longterm financing were ever made nor was any outside capital sought from any source. Of $253,000.00 listed as current unsecured obligations of the Debtor, $200,000.00 consists of a personal injury claim which is fully insured and $41,-000.00 consists of payments to the Debtor's general partner's wholly owned corporation. This obligation pre-dates the first case and is not, in fact, a post-confirmation obligation at all. Thus, there are only approximately $12,-000.00 in general unsecured claims arising post-confirmation. The Debtor's general partner's management firm has received over $225,000.00 in management fees during all of 1991 and 1992 through the date of the hearing.

Debtor's general partner has fifteen years experience operating motels and has been· involved in this property for fourteen years. Debtor contends that the changed circumstances justifying the filing of the second case include the following general items:

1) The opening of Shoney's Restaurant nearby. The opening of the Shoney's Restaurant occurred post-confirmation and prior

to the filing of the second case, but it was known at the time of confirmation that Shoney's was constructing a restaurant on the premises on the site.

2) Debtor listed approximately a dozen unexpected repair expenditures totalling $42,000.00 which occurred post-confirmation and prior to the filing of the second case. However, none of these repairs are extraordinary in the sense that all of them are for maintenance or repair of equipment and fixtures which are recognized to have a limited life expectancy such as cash registers, microwave oven, air conditioning units, wide screen television, electronic signs, and so forth.

3) The Debtor experienced increased activity in its motel during the buildup to and through the prosecution of the Middle Eastern war in the Winter of 1991. Debtor now asserts that it did not adequately anticipate the speed with which that business would fall off upon conclusion of armed conflict. However, the hostilities were concluded approximately three months prior to confirmation of the Debtor's plan and although the deployment back to the United States of large numbers of troops occurred for several additional months, the expectation that Debtor's business would continue the high level due to the war time activity is insupportable.

4) Breakdown of a large electronic sign situated on I–95 which attracts business to the property. This event is not the type of circumstance that is so unexpected that it could be considered to be unforeseeable nor was it demonstrated that this event was so financially catastrophic as to prevent Debtor from being able to refinance its $5.5 million note.

The above four circumstances are the only ones enumerated by the Debtor which occurred prior to the filing of the second case. The others all relate to events which have or will occur after the filing of the second case namely the anticipated opening of a Hampton Inn nearby and the anticipated opening of a Waffle House Restaurant nearby. The net effect of additional competition serves, in the Debtor's opinion, only to accentuate the current malaise in the travel industry which is at least in part a result of a slower than anticipated recovery from the economic recession in which the country has lingered for many months. The Debtor also established to the satisfaction of the court that although the filing of this Chapter 11 occurred immediately on the eve of the possible issuance of an order creating a receivership, Debtor recognized for several months prior to that time that it might be forced to seek additional relief in this court. Certainly from April 1992 forward it was a very real possibility that the Debtor would file a subsequent Chapter 11 case.

### CONCLUSIONS OF LAW

11 U.S.C. Section 1127(b) states, in pertinent part, that a reorganized debtor may modify a plan at any time after confirmation and before substantial consummation provided that certain conditions are met. "Substantial consummation" is defined at 11 U.S.C. Section 1101(2). Debtor does not dispute that the plan was substantially consummated.

■ Although there is no *per se* rule against successive filings, a debtor generally should not be permitted to go forward with a successive Chapter 11 reorganization case where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan. *See e.g., In re Holiday Fund, Inc.,* Case No. 89–20468 (Bankr.S.D.Ga.1989); *In re Northhampton Corp.,* 37 B.R. 110 (Bankr.E.D.Pa. 1984); *In re AT of Maine, Inc.,* 56 B.R. 55 (Bankr.D.Me.1985).

■ The courts have recognized, however, that in certain limited circumstances an exception to that rule may be appropriate. In *In re Casa Loma Associates,* 122 B.R. 814 (Bankr.N.D.Ga.1991), the court held that a serial Chapter 11 filing is permissible if the second case is filed in good faith and as a result of unforeseen changed circumstances. 122 B.R. at 818. Where, however, a debtor can anticipate the changed circumstances before confirmation of the first plan and later files a second petition to relieve itself of its

obligations under the prior plan, bad faith may be inferred. *In re Mableton–Booper Associates,* 127 B.R. 941, 944 (Bankr.N.D.Ga. 1991). In order for a debtor to rely on "changed circumstances," such circumstances must have been unknown at the time of the substantial consummation of the prior plan, and must have substantially affected the debtor's ability to perform that plan. *Casa Loma, supra,* at 818–19. "Finally, changed market conditions alone are not sufficiently changed circumstances to warrant a second filing." *Mableton–Booper, supra* at 944, *citing Casa Loma, supra* at 818.

The reasons for this latter rule are obvious. Changes in market conditions are a normal risk of doing business. If, upon the occurrence of a normal risk of doing business, a debtor were allowed to file a second reorganization case and thereby modify a substantially consummated plan of reorganization, the courts would be faced with never-ending Chapter 11 cases; creditors would neither be paid nor permitted to exercise their remedies. As this court previously has acknowledged, to permit the second case to go forward would "allow [the] debtor to continuously circumvent the provisions of a confirmed plan by filing Chapter 11 petitions *ad infinitum.*" *Holiday Fund, supra* at p. 6; *Northhampton, supra,* at 112–13.

Debtor cites *In re Jartran, Inc.,* 886 F.2d 859 (7th Cir.1989) to support its position in the instant case. In that case, the Seventh Circuit stated that the courts in *AT of Maine* and *Northhampton* "certainly could have concluded that in light of the Code's policy against modification of substantially consummated plans, a serial Chapter 11 filing designed to evade an existing plan was in bad faith." 886 F.2d at 867. In *Jartran,* however, the Seventh Circuit permitted the case to go forward because the debtor in that case was submitting a plan of liquidation, not a plan of reorganization. In contrast, in the instant case Debtor intends to reorganize, not to liquidate. Furthermore, even if Debtor intended to liquidate, it would serve no purpose because Debtor admits that Security Pacific has a first lien on virtually all of Debtor's assets and Debtor itself contends that the value of Security Pacific's collateral is substantially less than the amount of the debt.

During argument, Debtor also cited *In re Elmwood Development Company,* 964 F.2d 508 (5th Cir.1992). Although the Fifth Circuit agreed that unanticipated changed circumstances might justify a successive Chapter 11 case, the court did not find sufficiently changed circumstances to warrant that case and affirmed the Bankruptcy Court's dismissal. The court cited *Casa Loma, AT of Maine, Northhampton* and *Mableton–Booper* with approval.

■ In this case the court finds as a matter of law that there are insufficient "changed circumstances" to justify its filing. The Hampton Inn and Waffle House, which have not yet opened, obviously could not have affected Debtor's business operations. Although the opening of the Shoney's Restaurant may well have harmed the Debtor's operations, Debtor was aware, prior to confirmation of the first plan, that the Shoney's would open. Moreover, Debtor could not justifiably have relied on a continuously high level of military traffic when it knew, prior to confirmation of the plan, that the Persian Gulf War had ended. As for the "unanticipated" repairs Debtor made post-confirmation, the cost of those repairs was only $9,000.00 more than the estimated cost of *anticipated* repairs which Debtor did *not* make. The loss of that $9,000.00 did not substantially affect Debtor's ability to pay the debt of over $5.5 million to Security Pacific which came due on June 10, 1992. Furthermore, although the specific repairs may not have been anticipated, Debtor must have anticipated continuing maintenance and replacement expenses. As for Debtor's contention that the recession did not end as predicted, Debtor fails to show anything more than a change in market conditions, which is insufficient to justify a second Chapter 11 case under applicable authorities. In sum, the court finds as a matter of law that there were no unanticipated changed circumstances which substantially affected Debtor's ability to perform the plan.

With respect to the requirement of good faith, the standard is an objective one, rather than focusing on the subjective state of mind

of the Debtor's management. *Elmwood, supra* at 512.

[T]he determination of whether a bankruptcy petition is filed in good faith is made by an analysis of objective standards geared toward evaluating "whether reorganization is the proper course of action in a particular debtor's case." [citations omitted] A dismissal under this criterion is by no means synonymous with a finding that a case was filed with intent to harass a creditor.

*In re McCormick Road Associates,* 127 B.R. 410, 415 (N.D.Ill.1991). The court finds as a matter of law that the instant case was not filed in good faith according to these standards. The Debtor has only one asset, which is fully encumbered. It has few unsecured creditors, whose claims are small in relation to Security Pacific's claim. The property was the subject of a receivership action and contemplated foreclosure sale at the time the case was filed. Debtor's financial problems involve essentially a dispute between Debtor and Security Pacific. Although Debtor had contemplated the filing of a Chapter 11 case for several months, it did not actually file the case until shortly before a scheduled hearing on Security Pacific's motion to appoint a receiver. *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394–95 (11th Cir.1988).

In addition, Debtor materially defaulted on a consensual plan of reorganization achieved only after protracted negotiations with Security Pacific. The filing of a second reorganization case for the purpose of modifying a consensual plan of reorganization which Debtor was unable to perform does not constitute good faith. To permit debtors to file reorganization cases under such circumstances would only discourage creditors from entering into consensual plans. *See Elmwood, supra* at 511 ("After reaping the benefit of its bargain Elmwood sought to avoid its solemn obligation by filing *Elmwood II*").

In addition, Debtor has no reasonable prospect of successful reorganization. Debtor's general partner testified that he intended to try to raise capital from the limited partners, but it is undisputed that Debtor was unable to raise all of the capital required of the partners under the Consensual Plan.

Debtor was unable to explain how it would pay the unsecured claim of Security Pacific, which according to Debtor would be in excess of $3.5 million. Furthermore, Debtor anticipates the opening of two competing businesses which will detrimentally affect Debtor's operations.

Finally, it appears that this case would be of little or no benefit to Debtor's creditors and limited partners. It appears that the primary beneficiary of this case would be Huntington, which is wholly-owned by Debtor's general partner and would continue to receive management fees so long as Debtor owns the property.

For all the foregoing reasons, the court finds that this case was not filed in good faith under the objective standard described above and that there are insufficient "changed circumstances" to justify the continuation of this case.

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the automatic stay of 11 U.S.C. Section 362 is hereby modified so as to permit Security Pacific Credit Corporation to take all steps necessary or appropriate to foreclose on its collateral, including without limitation the sending of any notices permitted or required under state law or the documents between the parties, the advertisement and conduct of a foreclosure sale, and the filing and prosecution of an action to confirm said foreclosure sale in accordance with O.C.G.A. Section 44–14–161, along with the filing and prosecution of any appeals therefrom which may be necessary.