**In the Matter of BOUY, HALL & HOWARD AND ASSOCIATES, Debtor.**

**LINCOLN NATIONAL LIFE INSURANCE COMPANY, Movant,**

v.

**BOUY, HALL & HOWARD AND ASSOCIATES, Respondent.**

**Bankruptcy No. 95–40676.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Sept. 1, 1995.

Mark Bulovic, Savannah, GA, for debtor/respondent.

William Capp, Atlanta, GA, for movant.

## MEMORANDUM AND ORDER ON MOTION TO DISMISS AND FOR RELIEF FROM STAY

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Creditor, Lincoln National Life Insurance Company ("Lincoln National") comes before this Court requesting the dismissal of the above-captioned Chapter 11 proceeding. Lincoln National asserts that (1) the debtor has impermissibly filed this second Chapter 11 petition in bad faith and (2) the debtor's pre-petition conduct unreasonably interfered with Lincoln National's state law collection remedies as to constitute "cause" for relief from the automatic stay under Code § 362(d)(1); consequently, the matter should be dismissed so that Lincoln National may exercise its state law remedies. Based on the parties' briefs, the record on file, and applicable authorities, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Bouy, Hall & Howard and Associates ("Debtor") is a partnership that owns and operates a single-asset piece of commercial real property, namely, the Quality Inn Hotel located proximate to the "old" terminal at Savannah International Airport. Debtor has continually owned and operated the motel since 1969.

The Savannah Airport Commission ("SAC") possesses a fee-simple interest in the property underlying the hotel. In 1969, the parties entered into and have amended on various occasions a long-term ground lease which expires in the year 2029 and has approximately thirty-four years remaining. The agreement requires from the lessee a minimum payment of $500.00 per month, a monthly percentage of the gross receipts generated by the lounge and restaurant revenue, and a significant annual payment derived from a fixed percentage of the room rentals.[1]

During the late 1970's and throughout the 1980's, Debtor relied primarily on the financing provided for by Lincoln National and the Westinghouse Credit Corporation ("WCC"). To secure its loan, Lincoln National held a note in the original amount of $2,150,000.00 which was secured by a deed to secure a debt, a first lien security interest in Debtor's interest under the ground lease, an assignment of rents and profits, and a security interest in the personal property situated on or within the hotel. The Lincoln loan originated on November 15, 1979, carried a fifteen-year term, and was amortized over twenty years with a balloon payment. The Lincoln note carried a "basic" interest rate of 9.75% plus "additional interest" payable monthly in an amount equal to 1% of gross room revenue.

WCC held a note in the original amount of $1,600,000.00 which was secured by a second deed to secure a debt and security agreement on certain real property including all

---

1. In effect, the lease requires Debtor to make monthly payments of approximately $5,000 and an annual lump-sum payment of approximately $120,000.

room rentals and all other income derived from operation of the property. The WCC loan originated in 1986 and carried a four-year term, optionally extendable for a fifth year. Essentially, this loan was an interest only loan at "prime-plus two" with a minimum interest rate of 12% and a balloon payment nearly equal to the original principal amount of the loan.

On December 4, 1989, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in a case styled *In re: Bouy, Hall & Howard and Associates,* Ch. 11 Case No. 89–41946, U.S. Bankruptcy Court, S.D. Georgia ("BHH I"). Within the plan, Debtor restructured its debt and assumed a franchise contract with Choice Motels and the airport lease with SAC. The plan also listed Lincoln National's and WCC's claims in classes six and seven respectively, treating both claims as fully secured although impairing their interests. The two creditors objected to the impairment and requested a hearing on the hotel's value and the feasibility of the plan. They were the only two creditors who objected to the plan. All other classes or interests under the plan were either non-voting, voted to accept, or failed to cast a vote.

After reviewing the testimony of expert witnesses, this Court valued the hotel at $3,300,000.00. Since the claims of both creditors amounted to approximately $3,000,000.00, an "equity cushion" existed to the extent of $300,000.00. Over the creditor's objections, this Court determined that the plan was fair and equitable. On June 10, 1992, an order was issued denying the objections to confirmation and permitting the "cram-down" of both creditors.

At the time of confirmation of BHH I, Lincoln National held a class six secured claim of $1,305,183.79, including attorneys' fees, cost, and interest. The plan proposed to pay Lincoln National monthly installments of $18,725.88 over an eight-year period at 12% based upon a ten-year amortization. WCC held a class seven secured claim of $1,584,846.00, including attorneys' fees, cost, and interest. The plan provided to pay WCC monthly installments of $17,450.52 at 12% interest based upon a twenty-year amortization with a balloon payment in the year 2000.[2] Except for minor modifications which are not material to the facts and issues of this case, the reorganization plan did not otherwise substantially alter or modify Lincoln National's or WCC's state law default remedies under the note, deed to secure debt, assignment of rents, security agreement, and ground lease assignment. This Court confirmed the reorganization plan by order entered December 16, 1992.[3]

Over the course of the next two years, Debtor experienced a series of financial setbacks. The SAC relocated its terminal to the far side of the airport runway and taxiway system increasing the distance between the motel and airport from a few city blocks to a few miles.[4] Moreover, Key Airlines, a carrier which utilized Savannah as its hub filed bankruptcy in February of 1993.[5] Finally, American Airlines and United Airlines, two major carriers serving Savannah, discontinued their service to the city.

**2.** Additionally, the plan provided for the negative amortization of the debt during the first eight months. Under the plan, Debtor withheld half of the payment due each creditor to be used exclusively for physical improvements to the collateral. Moreover, the plan permitted Debtor to be up to ninety days late on no more than two payments.

**3.** The plan also disqualified the partners from taking a managing fee or other distribution from the motel during the course of this reorganization, except for the managing partner's salary which did not exceed $2,000.00 per month. The insiders have subordinated all of their claims.

**4.** Although Debtor failed to introduce evidence of the exact distance between the "old" and "new"

terminals, this Court on its own initiative takes judicial notice of that distance. Rule 201(b) of the Federal Rules of Evidence permits judicial notice of a fact not subject to reasonable dispute that is (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whom accuracy cannot reasonably be questioned. Rule 201(c) permits a court to take judicial notice whether requested or not.

**5.** On February 2, 1993, Key Airlines filed a voluntary petition under Chapter 11 of the Bankruptcy Code in a case styled *In re Key Airlines,* Ch. 11 Case No. 93–40226, U.S. Bankruptcy Court S.D. Georgia. On October 10, 1993, this Court converted the case to a Chapter 7.

When Debtor briefly emerged from bankruptcy, it was unable to sustain the requirements of the plan and eventually defaulted on some of its obligations. The Savannah Airport Commission declared Debtor in default on February 3, 1995, because Debtor missed its annual lump-sum payment along with a series of minimum monthly payments during the latter months of 1994.

In March of 1995, in order to prevent the termination of the ground lease and to protect its security interest in the lease interest in the hotel, Lincoln National advanced the sum of $134,091.43 to the SAC. After advancing the lease payments, Lincoln National instituted both foreclosure and receivership actions to protect its interest. Lincoln National filed the receivership action on April 3, 1995. The Chatham County Superior Court scheduled a hearing on Lincoln National's motion for a temporary restraining order and for an appointment of a receiver for April 12, 1995. On April 11, 1995, Debtor filed a second petition under Chapter 11 of the Bankruptcy Code initiating the instant case ("BHH II").

Debtor still remains a single-asset owner of commercial real property, namely, the same motel as in BHH I, although the value of the hotel over the past few years has plummeted. In 1992, the Chatham County Tax Assessor valued the motel at approximately $4,864,444.00. As previously mentioned, this Court assessed the value of the motel in June of 1992 at $3,300,000.00. Debtor, on its Chapter 11 petition filed April 25 1995, lists the hotel value at $1,500,000.00.

Regarding Debtor's two primary creditors, Lincoln National's secured claim was listed as $1,200,608.60 at the time of filing.[6] WCC recently transferred its interest to Creditor LW–SP2, representing Leman Capital Corporation, Westinghouse, and Lenmar collectively. LW–SP2's claim was listed as secured to the extent of $299,391.00 with the remaining $1,285,455.00 classified as unsecured. Thus, Debtor owes approximately $3,000,000.00 and possesses assets worth $1,600,000.00.

Debtor contends that its second filing should be permitted because of the unforeseen nature of several occurrences over the past few years and the severe economic hardship that resulted. First, as mentioned earlier, the City of Savannah relocated its terminal increasing the distance between the Quality Inn from a short walk to a circuitous drive. Second, Key Airlines failed. Third, United Airlines and American Airlines discontinued their service to the Savannah Airport causing crew-room occupancy to fall from approximately 10,000 rooms in 1992 to 4,000 in 1993.

Although Debtor has experienced economic hardship over the last two years, Debtor also argues that it now has a reasonable possibility of reorganization because of the recent discovery of a claim against the SAC. Debtor contends that the SAC made a material misrepresentation during the negotiations of the original lease and subsequent modifications when the SAC compelled Debtor to double the size of the motel in the mid–70's. Debtor alleges that the SAC knew about and failed to disclose its intention to relocate the airport terminal while inducing Debtor to make substantial financial commitments predicated on the old terminal location. Debtor is in the process of instituting a lawsuit against the SAC seeking monetary damages or a reduction of the lease, in an amount equal to the diminution in the value of its property which it claims is approximately two and a half million dollars. This Court has already approved special counsel for the limited purpose of bringing suit against the SAC to recover claims allegedly owed to Debtor.

6. Debtor claims that a recent tax assessment of the motel values the property at $1,500,000.00. Unfortunately, Debtor has not proffered this piece of evidence; however, neither Debtor nor the creditors have introduced any evidence that pertains to the value of the motel. Debtor has repeatedly stated during the hearings and in its brief that the value of the property is $1,500,-000.00 and that Lincoln National is fully secured. Lincoln National never objected to these statements or referred to the issue in its brief. Because the most recent documented valuation of the motel is that of this Court in its order of June 1992, for purposes of this motion, this Court will assume a hotel value of between $1,500,000.00 and $3,300,000.00. Thus, Lincoln National is fully secured.

Finally, in support of its position, Debtor notes the active participation and support of LW–SP2, a corporation that, unlike Westinghouse, has expressed a willingness to consider accepting a cash flow mortgage or an equity position in the hotel. According to Debtor, the possibility of getting a major creditor to accept something other than a fixed debt service arrangement significantly improves the prospects for reorganization.

Lincoln National asserts that Debtor's problems were either foreseeable or are purely economic. Lincoln National observes correctly that the relocation of the terminal was contemplated during the previous reorganization and therefore foreseeable. Lincoln National considers the failure of Key Airlines and the departure of both United Airlines and American Airlines to be inherent economic risks that fail to justify another Chapter 11 filing. Debtor responds that during BHH I it projected the Key Airlines hub as an occupant of the "old" terminal even after the airport relocated its terminal. In other words, Debtor contends that although it may have contemplated the moving of the airport terminal, it had never foreseen the occurrence of an unoccupied terminal, or at the very least the significant loss of business.

On May 26, 1995, Lincoln National filed a motion to dismiss and in the alternative requests the court to lift the stay for "cause" in accordance with Section 362(d)(1). Lincoln National submits that serial filing is impermissible and in bad faith except in three limited circumstances: (1) liquidation, (2) consent of all the parties, and (3) a change in the capital structure of the debtor. Debtor responds that the Supreme Court permits serial filings and that the present circumstances justify another opportunity to restructure its debt. This Court heard arguments on July 7, 1995; subsequently, the parties submitted briefs by July 24, 1995.

## CONCLUSIONS OF LAW

The propriety of a Chapter 11 serial filing (Chapter 22) has been recently examined in various degrees by two circuit courts [7], a few district courts [8], a number of bankruptcy courts [9], some commentators [10], and even this Court.[11] Although it is not necessary to sift through the history, development, and growth of the so-called Chapter "22," this discussion requires a review of the law at this moment as established by the appellate courts and interpreted throughout the bankruptcy system.

The Supreme Court, in an unanimous decision, upheld the validity of a Chapter "20" serial filing. *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). In its opinion, the Court reasoned as follows:

> Congress has expressly prohibited various forms of serial filings. *See e.g.,* 11 U.S.C. § 109(g) (no filings within 180 days of dismissal); § 727(a)(8) (no Chapter 7 filings within six years of a Chapter 7 or Chapter 11 filing); § 727(a)(9) (limitation on Chapter 7 filing within six years of Chapter 12 or Chapter 13 filing). The absence of a like prohibition of serial filings of Chapter 7 and Chapter 13 petitions, combined with

7. *See In re Jartran, Inc.,* 886 F.2d 859 (7th Cir. 1989); *Matter of Elmwood Development Company,* 964 F.2d 508 (5th Cir.1992).

8. *See In re Conston, Inc.,* 181 B.R. 769 (D.Del. 1995); *In re McCormick Road Associates,* 127 B.R. 410 (N.D.Ill.1991); *In re Sportpages Corporation,* 101 B.R. 528 (N.D.Ill.1989).

9. *See In re Delaware Valley Broadcasters Limited Partnership,* 166 B.R. 36 (Bankr.D.Del.1994); *In re Roxy Real Estate Co., Inc.,* 170 B.R. 571 (Bankr.E.D.Pa.1993); *Matter of Mableton–Booper Associates,* 127 B.R. 941 (Bankr.N.D.1991); *In re Casa Loma,* 122 B.R. 814 (Bankr.N.D.Ga.1991); *In re Garsal Realty, Inc.,* 98 B.R. 140 (Bankr. N.D.N.Y.1989); *In re Charterhouse, Inc.,* 84 B.R. 147 (Bankr.D.Minn.1988); *In re AT of Maine,*

*Inc.,* 56 B.R. 55 (Bankr.D.Me.1985); *In re Northampton Corporation,* 37 B.R. 110 (Bankr.E.D.Pa. 1984).

10. *See* Frank R. Kennedy, *Postconfirmation Issues: The Effects of Confirmation and Postconfirmation Proceedings,* 44 S.C.L.Rev. 621 (1993); Susan Jensen–Conklin, *Do Confirmed Chapter 11 Plans Consummate? The Results of a Study and Analaysis of the Law,* 97 Com.L.J. 297 (1992); Jonathan Moss, Note, *"Consecutive" Chapter 11 Filings; Use or Abuse?,* 19 Fordham Urb.L.J. 111 (1991); James D. Key, Note, *The Advent of the Serial Chapter 11 Filing and its Implications,* 8 Bankr.Dev.J. 245 (1991).

11. *See Matter of Savannah, Ltd.,* 162 B.R. 912 (Bankr.S.D.Ga.1993).

the evident care with which Congress fashioned these express prohibitions, convinces us that Congress did not intend categorically to foreclose the benefit of Chapter 13 reorganization to a debtor who previously has filed for Chapter 7 relief.

*Id.* at 87, 111 S.Ct. at 2156. Similarly, most courts agree that this same reasoning applies to the filing of consecutive Chapter 11's to the extent that they are brought in good faith by the debtor. The Seventh Circuit squarely addressed this issue and stated that, "... serial Chapter 11 filings are permissible under the Code *if filed in good faith,* as are liquidating plans. That the drafters may not have fully realized the results of these provisions in combination does not mean that they cannot be so used." *In re Jartran, Inc.* 886 F.2d 859, 867 (emphasis added). However, in support of its motion to dismiss, Lincoln National argues in its brief that, "[s]ections 1127(b) and 1141(a) impose an important element of finality in Chapter 11 proceedings, allowing the parties to rely on the provisions of a confirmed reorganization plan." *See* Lincoln National's Reply to Debtor's Brief in Response to Motion to Dismiss, p. 2. This Court agrees.[12]

■ A debtor should not be permitted to routinely file a successive Chapter 11 reorganization where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan. However, when the facts if the second case are significantly distinguishable from the first so as not to offend traditional notions of *res judicata,* a permissible exception exists. Although the standard for permitting the second Chapter 11 is "good faith", since good faith is a requirement of every Chapter 11

case under 11 U.S.C. Section 1129(a)(3), merely to utilize the ordinary "good faith" test to assess a serial-filed case is insufficient. To require no greater scrutiny of the subsequent case is to completely ignore Sections 1127 and 1141. Rather it is necessary for the debtor to demonstrate, after consideration of the first filing and the circumstances surrounding default, that the second petition is not an attempt to thwart the initial bankruptcy proceedings. *In re Elmwood Development Company,* 964 F.2d 508, 511.

The standard is an objective one. Debtor bears the burden to impress upon this Court that reorganization is appropriate considering the facts and circumstances of this case. Debtor must demonstrate more than a lack of malicious intention; instead, Debtor's affirmative duty is to convince this Court that its situation warrants the further protection of Chapter 11.

■ When analyzing a Chapter 11 serial filing, the inquiry of a debtor's good faith necessarily includes consideration of all factors collectively rather than determining if one factor mirrors a recognized exception. *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988) ("there is no particular test for determining whether a debtor has filed a petition in bad faith"); *In re Garsal Realty, Inc.* 98 B.R. 140, at 151 ("the determination of whether a Chapter 11 filing is made in good faith demands the objective consideration of 'the collective impact of the facts and circumstances, not a single feature in a particular case' to ascertain a valid reorganization purpose consistent with the debtor's economic reality").[13]

Consistent with these propositions, the bankruptcy court is in the best position to consider all factors, including the motives of

**12.** See *Jartran,* 886 F.2d at 868 (discussing whether the successive filing "effectively evaded all responsibility under the previous reorganization plan"); *McCormick,* 127 B.R. at 413 (purpose of bad faith filing test is to discern whether the case was filed to abuse the judicial process by, in particular, delaying or frustrating the creditors' efforts to enforce their rights); *Miller,* 122 B.R. at 367 ("Filing of successive Chapter 11 ... after substantial confirmation of a previously confirmed Chapter 11 case for the sole purpose of renegotiating previously agreed upon plan

treatment is an impermissible motive forming the successive case"); *Garsal,* 98 B.R. at 150 (the court inquiry should focus on "whether or not there was a pattern or strategy behind the filings to frustrate statutory requirements and abuse the bankruptcy process").

**13.** As mentioned earlier, Lincoln National advocates three limited instances to permit a Chapter 11 serial filing. *Supra* at 742. Instead of focusing on exceptions, this Court considers factors within the "totality of the circumstances".

the parties and the economic problems within its jurisdiction. *See Elmwood,* at 510 ("... good faith determination depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. A collation of factors, rather than any single datum, controls the resolution of this issue"). Further, a court that develops an understanding of the plan's dynamics while presiding over the initial Chapter 11 confirmation process possesses an additional vantage point from which to evaluate the intentions of the debtor.

So far, two courts have been willing to permit a serial filing over the objections of certain creditors.[14] Additionally, the Fifth Circuit, while affirming the dismissal of a bad faith petition, recognized that, "unanticipated changed circumstances may justify a valid successive request for Chapter 11 relief." *Elmwood,* 964 F.2d at 511. Lincoln National contends that Debtor has not experienced any unanticipated "changed circumstances" which justify this second filing and the motion for dismissal should be granted. *See Id.* ("Lack of good faith in the filing of a Chapter 11 bankruptcy petition constitutes cause for dismissal under 11 U.S.C. § 1112(b)").

 This court's inquiry must begin with an analysis of the similarities and distinctions of the two cases in light of U.S.C. Section 1141(a). I conclude that the salient question is whether the subsequent Chapter 11 case is so related in time or in substance to the earlier case that it represents a collateral attack on the initial order of confirmation? If so, traditional notions of *res judicata* are violated and the result is a bad faith filing. If not, *and* if the filing otherwise evidences good faith requirements of Chapter 11, then the debtor may proceed. The following factors are relevant when evaluating a subsequent Chapter 11 filing:

1) The length of time between the two cases;

2) The foreseeability and substantiality of events which ultimately caused the subsequent filing;

3) Whether the new plan contemplates liquidation or reorganization;

4) The degree to which creditors consent to the filing of the subsequent reorganization;

5) The extent to which an objecting creditor's rights were modified in the initial reorganization and its treatment in the subsequent case;

 Here, Debtor contends that the sole objecting creditor is fully secured, that substantial and unforeseeable changes within the market have developed, and that the estate possesses a colorable claim which if successful would greatly enhance Debtor's financial situation. Collectively, from Debtor's point of view, these circumstances display objective good faith as well as a reasonable prospect for a successful reorganization. Thus, as a result, Debtor argues that Lincoln National's motion to dismiss should be denied. For the following reasons, this Court believes that Debtor has carried its burden and demonstrated good faith.

In the instant case, Debtor persuasively argues that only Lincoln National has objected and that it is fully secured and adequately protected. For the purposes of this motion, I agree that Lincoln National is fully secured. Lincoln National's debt is approximately $1.2 million. So far, the motel's lowest estimated value is $1.5 million. It is conceded by all that Lincoln National's security interest which pervades all aspects of Debtor's business is one of first priority.

Moreover, the creditor that finds itself between the unenviable choice of foreclosure or reorganization is LW–SP2. LW–SP2 holds a second mortgage of approximately $1.5 million of which only $300,000.00 is apparently secured. LW–SP2's choice, at this point in the litigation, to support Debtor and encourage reorganization influences this Court's decision. Having a substantial creditor, with its financial resources and economic advisers, weighing the costs and benefits of both options and determining that at this point in the litigation, there is a reasonable prospect

---

14. *In re Jartran, Inc.,* 886 F.2d 859 (good faith requirement satisfied by debtor's intention to liquidate); *In re Casa Loma,* 122 B.R. 814 (change in market circumstances and change in federal housing law sufficient to meet debtor's good faith burden).

for a successful reorganization, strongly supports Debtor's contention of good faith. This Court understands why Lincoln National would prefer to pursue its state law remedies; however, the bankruptcy court's role is to enforce the Code while at the same time protecting the estate, and all creditors. By demonstrating that the only objecting creditor is fully secured and proffering the possible support of another major creditor, Debtor makes a strong showing of objective good faith.

As further support for its position, Debtor contends that it has experienced unforeseen changes in its market through the collapse of Key Airlines, the departure of American Airlines and United Airlines, and the movement of the terminal. Lincoln National responds to these contentions by stating that Debtor knew of the possibility of the terminal moving and that all other unforeseen developments were purely economic. Although it is true that, "changed market conditions alone are not sufficiently changed circumstances to warrant a second filing", *Mableton–Booper*, 127 B.R. at 944, where a debtor experiences a "fundamental change in its market" and not the typical fluctuations of supply and demand, if unforeseeable, the change may represent sufficiently changed circumstances to warrant a second filing.

When an unforeseeable economic change *effects* a significant change in the market, a second filing may be permitted. In the present case, Debtor not only demonstrated that the demand for its service decreased, but also that the market itself had been significantly altered. Debtor, formerly the closest motel to the airport terminal, was effectively removed from a dominant position in the small market of servicing customers who preferred lodging in motels proximate to the "old" terminal and transplanted into the large market of all motels within reasonable driving distance of the "new" terminal. Furthermore, this "fundamental change in its market" was unforeseeable. Although Debtor may have foreseen the terminal moving, it always had contemplated the Key Airlines hub occupying that terminal and relied on Debtor's location proximate to it. Thus, during its initial Chapter 11 case, Debtor never

considered the possibility of a significant change in its market resulting from the terminal's relocation, the failure of Key Airlines, *and* the withdrawal from Savannah of two major carriers, nor could it have been expected to foresee such a substantial change.

In *Casa Loma*, the Court found that an unforeseeable change in the federal law, prohibiting "adults-only" apartment complexes, satisfied the debtor's burden of good faith. *Casa Loma*, 122 B.R. 814. Presumably, the Court recognized that the effect of the new law was to force the apartment complex from a specialized "adults-only" market into the broad market of renting to the general public, a change of magnitude similar to what has occurred in this case.

Finally, Debtor contends that its lawsuit against the Savannah Airport Commission ("SAC") to recover the overpayment of rents allegedly caused by the SAC's misrepresentations evidences a good faith need for further protection of this Court during the pendency of that case. Debtor claims that the SAC failed to inform it of long-term plans to relocate when (1) Debtor entered its initial contract in 1969 and (2) Debtor doubled its occupancy during the late 1970's. Debtor values its own claim at approximately two and a half million dollars. Certainly it is difficult to judge the merit of this contention short of trial; however, Debtor's claim relates directly to the heart of its problem— reduced business caused by the moving of the terminal. This Court has inquired into the nature of the claim and theories of recovery finding them persuasive enough to approve of the retention of counsel for the limited purpose of pursuing this matter. Thus, this factor should also be considered within the "totality of the circumstances."

This conclusion is consistent with the previous case of *Savannah, Ltd.*, 162 B.R. 912. In *Savannah.* the debtor, attempting to avoid a short-term balloon payment created in its initial reorganization, relied on a number of minor "market condition" fluctuations. This lack of significantly changed circumstances coupled with strong evidence of bad faith by the debtor and its management caused the dismissal of the Chapter 11. Here, there is no evidence of bad faith other than the mere fact that this case represents Debtor's second filing.

In summary, Lincoln National argues that (1) Debtor's serial filing is impermissible and offends the bankruptcy system, (2) Debtor has not experienced any unanticipated "changed circumstances" which justify a second filing, and (3) Debtor cannot maintain simultaneous, open chapter 11 cases. In accordance with applicable authorities, I find that serial filing is permissible when the debtor acts in good faith as defined herein. Although Debtor's situation may not parallel other fact patterns where good faith has been found, I hold that Debtor has met the test sufficient to permit its case to proceed.[15] Finally, the Eleventh Circuit has acknowledged that the concurrent pendency of two bankruptcy cases is permissible. *In re Saylors,* 869 F.2d 1434 (11th Cir.1989) (Chapter 13 filing permitted even though Chapter 7 trustee had not filed final report). As a practical matter, many Chapter 11 cases are held open for administrative purposes, although in substance they are both substantially consummated and closed.[16]

Lincoln National asserts in the alternative that Debtor's failure to make its lease payments constitutes "cause" for dismissal under 11 U.S.C. 362(d)(1). While there is some authority for this proposition, if mere failure to pay one's debt, standing alone, were "cause" for relief, then each Chapter 11 would be dismissed for "cause" under Section 362(d)(1). Therefore, Lincoln National's motion to dismiss for "cause" under Section 362(d)(1) is denied.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions, IT IS THE ORDER OF THIS COURT that the Motion to Dismiss by creditor, Lincoln National Life Insurance Company, is DENIED.

---

**15.** It should be remembered that Debtor has not yet proposed how it may modify the rights of Lincoln National who still retains the ability to object to Debtor's plan at confirmation.

**16.** This practice varies between jurisdictions. The Southern District of Georgia usually closes its files within a few months of a Chapter 11 confirmation; however, various administrative necessities often require that the case remain "open" for an extended period of time.