**In the matter of MOTEL PROPERTIES, INC.,**
**Debtor.**

No. 03–22145.

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

April 15, 2004.

Jesse C. Stone, Swainsboro, GA, for Debtor.

## ORDER ON MOTIONS TO DISMISS OR CONVERT AND MOTION FOR RELIEF FROM STAY

LAMAR W. DAVIS, JR., Chief Judge.

This case was filed on December 4, 2003. Following preliminary hearings on issues relating to the use of cash collateral and other matters, Western United Life Assurance Company ("Western") filed both a Motion for Relief from Stay and a Motion to Dismiss or Convert this case on February 17, 2004. The United States Trustee filed a Motion to Dismiss or Convert on February 24, 2004, and Choice Hotels International, Inc., ("Choice") filed a Motion to Dismiss on February 26, 2004. The

matters were consolidated for hearing on March 22, 2004. This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 157. Based on the applicable authorities and relevant facts, the Court enters these Findings of Fact and Conclusions of Law in accordance with the directive of Bankruptcy Rule 7052.

## FINDINGS OF FACT

Debtor operates two motels on Jekyll Island, Georgia, and is before the Court for the second time in recent years. It filed its first Chapter 11 case on October 31, 2000, and the plan was confirmed on January 25, 2002. In June 2002 the Court approved an Amended Plan of Reorganization which permitted Debtor to refinance its then existing obligations with Movant Western. The modified plan provided for a loan from Western in the amount of $8.45 million to be repaid with interest of 12% per year based on a fifteen year amortization and a five year call. The new loan was secured by the Debtor's leasehold of real estate on Jekyll Island, Georgia, which it holds as a tenant of the Jekyll Island State Park Authority with a remaining term of twenty-five years. The loan was also secured by all the improvements on the property including furniture, fixtures, and equipment.

By Fall of 2003 the Debtor had reduced the outstanding principal balance on the loan to approximately $8.15 million, but it missed the November and December payments. After requesting a moratorium in payments, which Western refused, Debtor filed this case seeking to reorganize itself for the second time. Debtor has failed to make post-petition payments to Western and the interest accrual on the principal balance now totals over $400,000.00.

At the time the prior case was confirmed, Debtor made certain projections to demonstrate to its creditors and the Court the feasibility of its reorganization. Although those projections were prepared early in 2001, they remained the only evidence before the Court at the time of confirmation in January of 2002. See Exhibit P–7. The Debtor did not amend the projections or voice any concern that they did not contain viable numbers on which all the parties and the Court should rely. In reality, the Debtor's actual performance has been much worse than projected. See Exhibit P–8. Although there is not a precise overlap in the time periods measured, it is clear that the Debtor has failed to achieve its anticipated revenue growth. This failure triggered its inability to make the monthly payments to Western. In addition to delinquent principal and accrued interest on the note to Western, there are unpaid post-confirmation obligations totaling over $550,000.00 owed to the Glynn County taxing authorities, the Internal Revenue Service for payroll taxes, the Jekyll Island Authority for fees, and the Georgia Department of Revenue for taxes. See Exhibit P–11.

While Debtor's revenues have declined between 13% and 16% over the past five years, the trend in revenues for all hotels located on Jekyll Island has shown a 7% increase over the same period. See Exhibit P–1. Debtor contends that while its revenues have decreased over the five year period and revenues on Jekyll Island as a whole have increased, it is still performing better than many of the comparable motels in the area. See Exhibits D–4, D–5. An examination of Exhibits D–4 and D–5 partially supports Debtor's argument in that the Revenue per Available Room ("RevPar") and the Market Penetration of the Debtor's properties are above average. However, Debtor's RevPar and Market Penetration numbers have declined over the five year period–thus, the Exhibits are in conclusive at best.

A previous appraisal valued the Debtor's two motel properties at over $13 million. However, that appraisal is now woefully obsolete, and no current appraisal has been proffered at this point. Debtor estimates the current value of the two properties if sold at a distress sale to be between $10.5 and $11 million. Debtor concedes that a marketing period of one to two years would likely be necessary to sell the properties for this estimated value and that it would require a real estate commission of approximately 6% to consummate a sale. Adding the current principal indebtedness, accrued interest, and accrued interest for an estimated eighteen month marketing period yields a payoff on Western's obligation of over $10 million. A sale for $11 million less commission, outstanding taxes as of today, and projected taxes for the estimated marketing period would yield no more than $10 million. Furthermore, the Debtor acknowledges that additional capital improvements are needed although $1 million of the Western loan has been spent on capital improvements since confirmation.

The Debtor timely filed both its Disclosure Statement and Proposed Plan which provide for a restructuring of the Western debt to pay at 7% per annum rather than the current 12%. Debtor hopes, however, to refinance the Western debt and has spoken with another lender which it believes is willing to lend Debtor up to 70% of the fair market value of the two properties for a three year period at an interest rate of 10% per annum.

The confirmed plan in the previous case required the Debtor to assume its obligation to Choice for outstanding fees and expenses it owed as a franchisee and part of the Choice reservation network. Debtor, however, failed to cure the then outstanding $260,000.00 pre-petition arrearage obligation owed to Choice and ac-cumulated further arrearage post-confirmation in the amount of $180,000.00. As a result, Choice terminated the Assumed Franchise Agreement prior to the filing of this second case.

Since the filing of this case, the Debtor's monthly operating reports filed with the United States Trustee show that the company operated at a loss in December 2003 and January 2004 and essentially broke even in February of 2004. However, its accounts payable over this period have increased, post-petition taxes have not been paid, and no debt service payments have been made to Western. In short, the Debtor is operating post-petition at a substantial loss in the second case. Admittedly, this has occurred during the slowest season for motel occupancy on Jekyll Island, Georgia, but this is a fact with which Debtor and its management are both familiar having been in business in that market for over forty years.

The Movants assert in their Motions to Dismiss or Convert that the case should be dismissed or converted because (1) pursuant to 11 U.S.C. § 1112(b)(1) there is a continuing loss to or diminution of the estate in the post-petition period and there is no reasonable likelihood of rehabilitation; and (2) the second case was not filed in good faith or under such circumstances as would permit a successive filing of a second Chapter 11 under applicable authorities.

In response, Debtor argues that although the plan was substantially consummated, there have been substantial unanticipated changes in circumstances causing its inability to achieve the projected revenues. It points to the tragic attacks on the United States by international terrorists on September 11, 2001, and the subsequent decline in the travel and tourism industry. While admitting that the projections submitted to the Court at the time of

confirmation showed otherwise, it argues that the confirmation projections were made prior to September 11, 2001, and in effect should not be binding on the Debtor at this time. Debtor further contends that the commencement of the Iraq war in March of 2003 has hurt its business. Finally, Debtor asserts that the decline in the economy during 2002–2003 was unanticipated and had a dramatic effect on the market. For example, when state revenues fell, many groups intending to meet at Jekyll Island either cancelled their meetings or reduced them in size. Debtor asserts that these unanticipated factors justify its second filing.

Debtor has prepared new projections suggesting that its future prospects are more optimistic than they have been over the past two years. Debtor points to the improvement in the economy, the 2004 G–8 conference in Coastal Georgia, and the 2005 Superbowl in Jacksonville, Florida, approximately 60 miles away. Debtor also plans to house students of the Federal Law Enforcement Training Center ("FLETC"). During the month of May, Debtor will realize more than $31,000.00 from its arrangement with FLETC. Additionally, Debtor reduced its staff by approximately 25% which it claims it can maintain without any appreciable loss in service to its customers. Debtor is also negotiating a new franchise agreement with Best Western. Based on these factors, Debtor believes that it can increase revenues for the current year to over $9.2 million although its total revenues for the previous year were approximately $1 million less–an increase of more than 12% in a single year. *See* Exhibits D–2, D–3, P–3.

### CONCLUSIONS OF LAW

1. *Continuing Loss to or Diminution to the Estate*

■ Movant Western asserts that Debtor's case should be dismissed for cause pursuant to 11 U.S.C. § 1112(b)(1) which provides in relevant part:

> Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including–

> (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation

The movant has the burden of proof in a motion under Section 1112(b). *Bal Harbour Club, Inc. v. AVA Dev. Inc. (In re Bal Harbour Club, Inc.)*, 316 F.3d 1192, 1195 (11th Cir.2003).

■ To determine if there is a continuing loss to or diminution of the estate, the Court must look beyond financial statements and fully evaluate the present condition of the Debtor's estate. *In re Moore Constr., Inc.*, 206 B.R. 436, 437–38 (Bankr. N.D.Tex.1997). Courts have held that a post-petition negative cash flow and an inability to satisfy current expenses constitute a loss to or diminution of the estate. *See, e.g., In re Galvin*, 49 B.R. 665, 669 (Bankr.D.N.D.1985)("Post-petition negative cash flow is considered by courts to be evidence of continuing losses required by section 1112(b)(1).").

The Debtor has consistently lost money since exiting the first bankruptcy, and it has continued to lose money post-petition. Debtor has failed to make any payments to Western and interest totaling over $400,000.00 has accumulated on that loan. In addition, substantial debt has accrued to the Glynn County Taxing Authorities, the Internal Revenue Service and the Je-

kyll Island Authority. The Court concludes that the Debtor is experiencing a continuing loss to or diminution of the estate. *See, e.g., Faden v. Faden*, Civ. No. 90–2863, 1990 WL 191861, at *3 (D.N.J. Nov.5, 1990); *In re Midwest Communications, Inc.*, 269 B.R. 40, 42 (Bankr. N.D.Iowa 2001); *In re Kay*, 185 B.R. 873, 875 (Bankr.M.D.Fla.1995).

■ Section 1112(b)(1) is written in the conjunctive; therefore, it requires both a loss to or diminution of the estate and an absence of a reasonable likelihood of rehabilitation. In this context, rehabilitation means that the "debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." *In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y.2003). Some courts have held that short-term postpetition operating losses are not sufficient grounds to convert or dismiss a bankruptcy case when financial viability is reasonably likely in the future. *Id.* (citing *In re Garland Corp.*, 6 B.R. 456, 460 (1st Cir. BAP 1980)).

■ Movant Western asserts that Debtor's steady decrease in profits and its loss of the Choice franchising agreement reveal Debtor's inability to rehabilitate. However, there are reasons to believe that financial viability is possible. Debtor is negotiating a new franchising arrangement with Best Western, and the contract to house FLETC students has the potential to bring in large amounts of revenue. The upcoming events such as the SuperBowl and G–8 in addition to the summer tourist season all point to financial viability. Furthermore, Debtor has made internal changes such as decreasing the size of its staff. Without further evidence, Western has failed to satisfy its burden of proving an absence of a reasonable likelihood of rehabilitation; therefore, Western's Motion to Dismiss or Convert pursuant to 11 U.S.C. § 1112(b)(1) is denied.

## 2. Successive Filings

■ As I noted in *Savannah, Ltd.*, "[a]lthough there is no *per se* rule against successive filings, a debtor generally should not be permitted to go forward with a successive Chapter 11 reorganization case where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan." *Sec. Pac. Credit Corp. v. Savannah, Ltd., (In re Savannah, Ltd.)*, 162 B.R. 912, 915 (Bankr.S.D.Ga.1993). Furthermore, I concluded that, "the salient question is whether the subsequent Chapter 11 case is so related in time or in substance to the earlier case that it represents a collateral attack on the initial order of confirmation? If so, traditional notions of res judicata are violated and the result is a bad faith filing." *Lincoln Nat'l Life Ins. Co. v. Bouy, Hall & Howard and Associates (In re Bouy, Hall & Howard and Associates )*, 208 B.R. 737, 744 (Bankr.S.D.Ga.1995).

■ A debtor's lack of good faith constitutes cause for dismissal of any petition. *See Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va., (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393, 1394 (11th Cir.1988). In the case of successive Chapter 11 filings the debtor must show more than good faith:

[S]ince good faith is a requirement of every Chapter 11 case under 11 U.S.C. Section 1129(a)(3), merely to utilize the ordinary "good faith" test to assess a serial-filed case is insufficient. To require no greater scrutiny of the subsequent case is to completely ignore Sections 1127 and 1141. Rather it is necessary for the debtor to demonstrate, after consideration of

the first filing and the circumstances surrounding default, that the second petition is not an attempt to thwart the initial bankruptcy proceedings.

*Bouy, Hall & Howard and Associates*, 208 B.R. at 743. Therefore, the subsequent case is permissible only if it is filed in good faith and as a result of substantial, unforseen changed circumstances. *Savannah, Ltd.*, 162 B.R. at 915 (citing *CFC 78 P'ship B v. Casa Loma Associates (In re Casa Loma Associates)*, 122 B.R. 814, 818 (Bankr.N.D.Ga.1991)). When a debtor is able to anticipate the changed circumstances prior to confirmation of the first plan, yet it files a second petition to relieve itself from the requirements of the prior plan, then bad faith may be inferred. *Integon Life Ins. Co. v. Mableton–Booper Associates (In re Mableton–Booper Associates)*, 127 B.R. 941, 944 (Bankr.N.D.Ga. 1991).

 The burden is on the Debtor to demonstrate that reorganization is appropriate under the facts and circumstances of the case. The good faith standard is an objective one; therefore, the Court need not give dispositive weight to the testimony of the subjective state of mind of the Debtor's management. *Bouy, Hall & Howard and Associates*, 208 B.R. at 743; *Savannah, Ltd.*, 162 B.R. at 916–17.

 In *Bouy, Hall & Howard and Associates*, this Court established factors to be considered when evaluating successive Chapter 11 filings. The following five factors were enumerated:

1. The length of time between the two cases;

2. The foreseeability and substantiality of events which ultimately caused the subsequent filing;

3. Whether the new plan contemplates liquidation or reorganization;

4. The degree to which creditors consent to the filing of the subsequent reorganization;

5. The extent to which an objecting creditor's rights were modified in the initial reorganization and its treatment in the subsequent case.

When determining if the second filing was in good faith, the Court considers all factors collectively. *Bouy, Hall & Howard and Associates*, 208 B.R. at 743–44.

### 1. Length of Time Between the Two Cases

 The Debtor filed the second case within two years of the first case. Debtor's plan was confirmed in the first case on January 25, 2002 and modified in June 2002, and this case was filed December 4, 2003.

### 2. Foreseeability and Substantiality of Events Causing Subsequent Filing

 One of the foreseeable risks of operating any business is the fluctuation in supply and demand and its impact on the market. For that reason, "changed market conditions alone are not sufficiently changed circumstances to warrant a second filing." *Mableton–Booper Associates*, 127 B.R. at 944. A second filing will be permitted when an *unforeseeable* economic event fundamentally changes the market conditions. *Bouy, Hall & Howard and Associates*, 208 B.R. at 745.

Debtor asserts that the terrorist attacks on September 11, 2001, constitute an unforeseeable change in circumstances justifying a second filing. Although Debtor formulated its projections prior to September 11, 2001, confirmation was in January of the following year and there was a modification approved in June 2002, well after the events of September 11, 2001. Debtor had ample opportunity to amend the projections before the Court; there-

fore, the economic fallout from the attacks do not constitute an unforeseeable change in circumstances that would justify this new case. *See Savannah, Ltd.,* 162 B.R. at 916 ("Debtor could not have justifiably relied on a continuously high level of military traffic when it knew, prior to confirmation of the plan, that the Persian Gulf War had ended."). Debtor also contends that the outbreak of the Iraq war was an unforeseen circumstance that significantly changed the market conditions. However, Debtor failed to present any evidence illustrating a correlation between the decline in revenues and the Iraq war.

Finally, Debtor contends that the general decline in the economy and the length of the recession justify the filing of the second petition. Debtor did not present evidence that the decline in the economy was anything more than the general market fluctuations in an industry dependent upon the discretionary spending of its consumer base. These changes in market conditions are insufficient to justify a second Chapter 11 case. *Id.*

### 3. Whether the New Plan Contemplates Liquidation or Reorganization

The new plan contemplates a second reorganization as opposed to a liquidation. A liquidation, in contrast to a reorganization, appears less like an attempt to evade the responsibilities of the old reorganization plan. *See In re Jartran Inc.,* 71 B.R. 938, 942 (Bankr.N.D.Ill.1987)("Jartran II is not an attempt to modify the terms of the Plan, but rather is a good faith admission that Jartran was unable to continue operating as a going concern."). A liquidation plan is more likely filed in good faith. *See, e.g., Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859, 868–69 (7th Cir.1989)(finding that the second Chapter 11 was filed in good faith and emphasizing that the Debtor filed a liqui-dation plan instead of a reorganization plan).

### 4. Degree to which Creditors Consent to New Filing

A second filing is normally not permitted over the objection of a creditor whose claim is to be dramatically prejudiced by the filing. *In re Tillotson,* 266 B.R. 565, 570 (Bankr.W.D.N.Y.2001). *But see Bouy, Hall & Howard and Associates,* 208 B.R. at 745 (allowing second filing but emphasizing that sole objecting creditor was fully secured and adequately protected). Western, the largest creditor in the case, indeed the creditor that provided the funding for the prior case, is objecting to the filing. In addition, Choice, another large creditor, and the United States Trustee have objected to the filing.

### 5. Extent to which Objecting Creditor's Rights were Modified in Initial Reorganization and its Treatment in Subsequent Case

This factor weighs heavily in this particular case. Debtor's new plan proposes to reduce the interest rate payable to Western from 12% to 7% without any showing that this is the market rate of interest for loans such as this. In fact, Debtor, in hopes of refinancing the loan from Western, has found another lender willing to lend Debtor up to 70% of the market value of the properties at an interest rate of 10%. Western currently has a higher loan-to-value ratio than the new lender is proposing; therefore, it seems unlikely that the market rate of interest for Western's loan should be 3% less than that of the new lender.

Debtor's new plan also dramatically alters Choice's treatment under the original plan. In the first case, Choice was an administrative priority creditor. In the Court's confirmation order, Debtor was or-

dered to cure the pre-petition lease arrearage and make post-confirmation payments in the amount of $180,607.45 per month. If this Court approves the subsequent filing, Choice will be relegated to an unsecured creditor.

In weighing the foregoing factors, the Court finds that this case was not filed following a substantial, unforeseeable change in circumstances after confirmation of the first plan, nor does it pass the good faith test under the objective standard described above.

## CONCLUSION

The Eleventh Circuit held that "the prospects of a successful reorganization do not override, as a matter of law, the finding of bad faith in this case or compel, as a matter of fact, a contrary finding." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988). Therefore, based on the foregoing factors, I hold that the Motions to Dismiss should be granted. As the Motions to Dismiss have been granted, the Motion for Relief from Stay is moot.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Motions to Dismiss are GRANTED.