In re Paul E. TILLOTSON, d/b/a
Cottonwood Farms, Debtor.

No. 01–10134 K.

United States Bankruptcy Court,
W.D. New York.

April 25, 2001.

David H. Ealy, Shapiro, Rosenbaum, Liebschutz & Nelson, LLP, Rochester, NY, for debtor.

MICHAEL J. KAPLAN, Bankruptcy Judge.

The question before the Court is so easy to state that it may deceive one into expecting an easy answer. The question is this: If a reorganization court's finding that a Chapter 11 plan was "feasible" turns out to be so wrong that the plan not only fails, but, in addition, the value of what had been a fully-secured lender's collateral has been substantially diminished, may that debtor foist that loss upon the lender by a serial filing that proposes a new plan that strips the secured claim down to the diminished value? Stated otherwise, may a second filing be employed to place the burden of that loss on the lender, or is such a debtor left forever without another chance to reorganize? The answer is that "objective good faith" is lacking in the second filing, at least at this time. Whether a different result would be reached had the losses occurred gradually over a longer period of time will await a proper case.

Here the Debtor is a dairy farmer who in an earlier Chapter 11 case had a plan confirmed in which he and the bank agreed that the bank's $1.48 million claim was fully secured and that he could retire it at the rate of $17,000 per month. This was on the basis of careful projections and detailed planning between the farmer and the bank. The bank even extended a small amount of new money. The Debtor was to increase the size of his herd to a specified number to optimize milk production. Milk price fluctuations were predicted and averaged out; a conservatively low price was employed in the projections as the price of milk. Cull-rates were anticipated. All normal incidents of dairy farming in this region were considered and entered into the agreed calculations. Future borrowing (from the bank and from another source) for increasing the size of the herd was arranged and specified in the Plan.

No judicial determination of value of the farm was required.

The elements conspired against Debtor, however. Illness struck the herd, reducing income and increasing veterinary expenses. Heavier-than-normal snowfall collapsed a portion of the barn, further depressing the income, at least for a time. Milk prices fell, though not quite as low as the figure that was used in the plan computations. Regular spring "planting loans" that the Debtor used to get from others became unavailable, and he had to buy feed rather than grow it. The repairs to the collapsed barn turned out to be insufficient and the barn collapsed again. Rather than missing the scheduled payments to the bank, the Debtor, without the bank's knowledge, used the insurance proceeds from the second barn collapse to make monthly mortgage payments to the bank, rather than repairing the barn.

All in all, even though the Debtor got the loans to buy cows, he was never able to get the herd size up to the number that the Plan required. Instead, it has declined. And with the damaged barn, the

Debtor could not provide for a larger herd even if he had more money to buy cows. With benefit of hindsight it can be said that the Plan simply was not feasible.

The payments that he made by use of the insurance proceeds were the last payments he made to the bank. The Debtor continued to make payments to other, much smaller creditors.

On the eve of a foreclosure sale and replevin of his herd, he filed this second Chapter 11 case. By both sides' appraisals, the bank is now substantially undersecured because the herd is dramatically smaller. The Debtor asserts that the portion of the loan that is secured by a mortgage on the farm remains fully secured, but that the portions of the loan secured by livestock, equipment, inventory and crops are now undersecured by nearly a half million dollars, perhaps more.

The Debtor's new proposal is to pay the bank approximately $7,000 per month instead of the $17,000 per month that was provided for in the prior Chapter 11 plan. What had been a fully-secured claim of over $1.4 million to be fully paid over the course of twenty to twenty-five years [1] will become a stripped-down secured claim of only $870,000 to be fully paid over thirty years, with the balance allowed as an unsecured claim to be paid twenty cents on the dollar over the course of five years.

### ISSUE

The bank has sought dismissal of this case claiming it was filed in bad faith, has sought lift of stay to permit its foreclosure and its replevin to continue, and has also reserved its right to object to the proposed Plan and to challenge its feasibility.

The policy issue is profound. The prior Chapter 11 plan was confirmed in February of 1998. If, in February of 1998, a lender is owed $1.4 million on a fully-secured basis, and pays no attention to actual conditions on its borrower's farm until payments stop in the summer of the year 2000 and the borrower files a Chapter 11 petition and proves that the fates have devastated the value of the farm, there can be no doubt about the fact that it is the secured claim of the bank, not the borrower, that bears that loss of collateral value, assuming that all the other requisites to confirmation of a Chapter 11 plan are met. The lender's secured claim is based on the value of the collateral as of the filing date, and the loss of value while the lender was not vigilant is of no moment, so long as the loss does not continue after the Chapter 11 filing.

That is not uniquely a "bankruptcy result." That would be the result in a fair market value sale after foreclosure. The only "bankruptcy" feature is that the borrower may continue to own the property and to pay the bank over time, with a present-value factor added, and with the borrower having an obligation to pay the unsecured deficiency claim to the extent required by the Chapter 7 test. (Under non-bankruptcy law, a borrower might not have liability on the unsecured deficiency.)

But here, the bank had sought to foreclose back in 1996, when it was fully secured. That led to the Debtor's first Chapter 11 filing. The bank was diligent in preserving and protecting its rights during the pendency of the Chapter 11 case. Recognizing the reality of what a debtor can accomplish under Chapter 11, the bank consented to a stretch-out, but on carefully negotiated terms to protect both the

---

**1.** There were in fact a number of different notes in varying amounts, and were to be retired under various schedules under the earlier confirmed plan. The twenty-five and thirty year provision applied to the largest notes.

bank's security and its income stream from the Debtor. The process of Chapter 11 took about two years. For about two years after that the bank received payments. Apparently, the bank did not, however, inventory the herd or make other inspections to see if the Debtor was complying with aspects of the plan other than making the monthly payments to the bank. But when the payments stopped, the bank again diligently sought foreclosure upon the real property and replevin of the personal property. The new Chapter 11 filing came on the eve of replevin.

In the past five years, therefore, there have been only about 22 months that the Debtor has not been under the § 362 protection of this Court. And in those 22 months alone, the bank's collateral dropped perhaps a third in value, now rendering the bank undersecured.

The Debtor's argument is this: "I did nothing wrong. I suffered ill fortune that had not been contemplated during the course of my prior Chapter 11 proceeding. I am not trying to get a better deal to improve 'profits.' Rather, my family has owned this farm for over 100 years and I am trying to save it. What I agreed to and thought I could achieve in my first Chapter 11 case should not be held against me now. What I am proposing is the best I can do on a 'scaled-down' farm."

From the bank's perspective, the Debtor's arguments seem to be this: "Now that I have failed to increase the herd size and have failed to maintain the farm, I get to propose a plan that I can afford based on the herd size and barn conditions that I'm left with, and you (the bank) must 'eat' the difference. And I did it all under the protection of the Court and even though my failures put me in default of a Court-approved plan."

## REPEAT FILINGS

■ The law regarding repeat Chapter 11 filings seems to be fairly well understood in principle, though sometimes hard to apply. Some courts have analyzed repeat filings under common law doctrines of judicial estoppel or *res judicata*, and others in the context of the fact that 11 U.S.C. § 1127 prohibits a modification of a confirmed Chapter 11 plan after that plan has been "substantially consummated." Courts do not permit a debtor to avoid the binding effect of 11 U.S.C. § 1141 by filing a second Chapter 11 petition to achieve a modification that would be prohibited under § 1127.

The large manufacturing company cases or airline cases involving serial filings do not offer any "bright-line" rules, perhaps because key creditors in those cases had not opposed refiling, and might have even encouraged it. Thus, for example, the third Chapter 11 of Trans World Airlines, Inc., was before the court in *In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D.Del.2001). In that case, affiliates of financier Carl Icahn did not attack the third filing as such, but rather attacked the debtor's decision to seek to reject an agreement that was incorporated into the Plan of Reorganization in the second Chapter 11 case of TWA, and they premised their arguments principally on judicial estoppel and *res judicata*. The Delaware bankruptcy court was unconvinced that the agreement in question was an "integral component" of the confirmed reorganization Plan that ended the second Chapter 11, and consequently found that those principles did not militate against granting the Debtor's motion to reject the agreement.

Illustrative of the Courts that had to address refiling in the context of § 1127 is *In re Adams*, 218 B.R. 597 (Bankr.D.Kan. 1998).

The court in that case ably summarized the cases on this subject as follows:

Courts agree that the general rule is that a reorganized debtor may not file a new plan to effect a modification of its substantially consummated plan. The terms of a confirmed plan are binding on the parties and should be given *res judicata* effect. The terms of a confirmed plan usually represent the results of negotiations between the debtor and its creditors, and the parties should be able to rely on the finality of those terms. . . . Once its plan is substantially consummated, the debtor should not be able to circumvent or evade its binding responsibilities by filing what is in effect a modified plan. Property has been transferred, management of the property has been assumed, and distribution has commenced. The debtor and the creditors have now acted in reliance on the terms of the confirmed plan and in the interest of finality, the plan should no longer be subject to modification. . . .

Yet, there is no per se prohibition of successive bankruptcy filings. In *Johnson v. Home State Bank*, the Supreme Court noted the absence of a statutory prohibition of serial filings and ruled that a debtor could file a Chapter 13 bankruptcy after the debtor had filed a Chapter 7 case. And, in *In re Jartran*, the court allowed the debtor to file a second Chapter 11 case, holding that 'serial Chapter 11 filings are permissible under the Code if filed in good faith.' While the *Jartran* court found no per se prohibition against serial filings, in that case, the debtor's second Chapter 11 was for purposes of liquidation. The court found that the debtor was not trying to circumvent the binding terms of a confirmed plan, but was attempting an orderly liquidation after having failed to successfully reorganize under the terms of its prior Chapter 11 plan.

Other courts, however, have allowed the debtor to file a second Chapter 11 reorganization case after failing in the first Chapter 11 reorganization plan, if the debtor is acting in good faith. These courts have thus recognized exceptions to the general rule that a debtor may not modify a substantially consummated Chapter 11 plan. The recognized exceptions are premised on the debtor's good faith as demonstrated by the debtor's genuine need for a new Chapter 11 plan. This genuine need is established by an extraordinary change of circumstances after substantial consummation. Because the debtor should generally be bound by the terms of the confirmed plan and live with the benefits and burdens of its bargain, only changes that were unanticipated and not reasonably foreseeable at the time of confirmation or substantial consummation can justify the filing of a new reorganization plan. If the debtor's income decreases or expenses increase because of ordinary and foreseeable changes in the debtor's operations, or in the market, that does not constitute a sufficient change in circumstances. The occurrence of ordinary, foreseeable risks of doing business should not relieve the debtor of the terms of its confirmed plan.

. . .

Thus, changes associated with the realities of economic change are an insufficient reason to allow a new bankruptcy case. When the reorganized debtor and its creditors bargained for and agreed to the terms of the confirmed plan, the debtor is charged with crafting a plan that could absorb economic changes, and failing that, the debtor understood its risk in proceeding to confirmation under terms and assumptions that could change.

On the other hand, where events and occurrences have transpired that are extraordinary and not reasonably foreseeable, the debtor should not be forever barred from attempts to reorganize.

. . .

Even extraordinary and unforeseeable changes will not support a new Chapter 11, if these changes do not substantially impair the debtor's performance under the confirmed plan.

*Id.* At 600–602. [case authorities omitted.]

There appears to be no dispute among the courts regarding the above statement of the applicable law. In examining the cases cited by the parties here and other cases, one finds not a single case in which refiling was permitted over the objection of a creditor whose claim was to be dramatically prejudiced by the refiling.[2] (There was, however, one case in which the refiling was permitted but the stay was lifted to permit the secured creditor to foreclose.[3] And there are several cases in which the principal secured creditor was the objector and was going to be affected, but the courts emphasized that the creditor was still fully-secured and was still proposed to be paid in full.[4])

■ Moreover, from these cases it can be seen that although an extraordinary change of circumstances after substantial

consummation is "necessary" to the requisite showing of good faith to permit a successive filing that would circumvent the binding terms of a confirmed plan, an extraordinary change of circumstances is not, of itself, "sufficient" to constitute such good faith. Rather, as stated in the *Bouy, Hall,* case,

"good faith is a requirement of every Chapter 11 case under 11 U.S.C. § 1129(a)(3) [and so the debtor] bears the burden to impress upon this Court that reorganization is appropriate considering the facts and circumstances of this case.

. . .

When analyzing a Chapter 11 serial filing, the inquiry of a debtor's good faith necessarily includes consideration of all factors collectively rather than determining if one factor mirrors a recognized exception.

. . .

This court's inquiry must begin with an analysis of the similarities and distinctions of the two cases in light of U.S.C. § 1141(a). . . . [T]he salient question is whether the subsequent Chapter 11 case is *so related in time or in substance to the earlier case that it represents a collateral attack on the initial order of confirmation* [.] If so, tra-

---

**2.** *In re Elmwood Development Company,* 964 F.2d 508 (5th Cir.1992); *In re Northtown Realty Co.,* 215 B.R. 906 (Bankr.E.D.N.Y.1998); *In re Savannah, Ltd.,* 162 B.R. 912 (Bankr. S.D.Ga.1993); *In re Henke,* 127 B.R. 255 (Bankr.D.Mont.1991); *In re Miller,* 122 B.R. 360 (Bankr.N.D.Iowa 1990)

*See also, In re Delray Associates Limited Partnership,* 212 B.R. 511 (Bankr.D.Md.1997); *In re 234–6 West 22nd St. Corp.,* 214 B.R. 751 (Bankr.S.D.N.Y.1997); *In re Roxy Real Estate Co.,* 170 B.R. 571 (Bankr.E.D.Pa.1993)—in those cases the objections to a second filing were sustained because the court found lack of good faith by the debtor. But *see, In re Jartran, Inc.,* 886 F.2d 859 (7th Cir.1989) (a

decision that allowed second filing where there was a plan failure and the second filing was allowed to conduct an orderly liquidation); *In re Woodson,* 213 B.R. 404 (Bankr. M.D.Fla.1997).

**3.** *In re Garsal Realty, Inc.,* 98 B.R. 140 (Bankr.N.D.N.Y.1989).

**4.** *In re Bouy, Hall & Howard and Associates,* 208 B.R. 737 (Bankr.S.D.Ga.1995). To a similar affect see *In re Casa Loma Associates,* 122 B.R. 814 (Bankr.N.D.Ga.1991); *In re Roth,* 167 B.R. 911 (Bankr.D.S.D.1994); *In re Adams,* 218 B.R. 597 (Bankr.D.Kan.1998).

ditional notions of *res judicata* are violated and the result is a bad faith filing. If not, and if the filing otherwise evidences good faith requirements of Chapter 11, then the debtor may proceed."[5] *Id.* at 743. [Emphasis added.] (Internal citations omitted.)

That court was dealing with a debtor who continued to propose full payment to the objecting creditor, which creditor was found by the court to be fully secured. The court stated "[b]y demonstrating that the only objecting creditor is fully secured and proffering the possible support of another major creditor, Debtor makes a strong showing of objective good faith." *Id.* at 745.

Here, we have a debtor who clearly demonstrates "subjective" good faith—he is trying to save what has been his family's farm for more than 100 years and has suffered some devastating reversals. But he wants to be completely relieved of the prior Plan and wants to visit all of the losses that have occurred since confirmation of the prior Plan upon the bank.

▇▇▇ As noted earlier in this decision, in a normal case (which is to say one in which there was no prior case that resulted in a substantially consummated confirmed plan) the kind of strip-down the debtor proposes is virtually automatic where the secured creditor had been "asleep at the switch" while the value of its collateral was being dramatically eroded. Here, however, it has been eroded under the Debtor's court-ordered management and control either as a debtor-in-possession or as a debtor performing under a court approved Plan of Reorganization, and the lender has been diligent and active here for five years. In essence, the bank's 1996 effort to foreclose has effectively been stalled for five years, to the bank's substantial detriment. This writer has often stated that the "good faith" requirement of Chapters 11, 12 and 13, simply requires "fundamental fairness." It is not "fundamentally fair" for the Debtor to say (albeit with "subjective" good faith), "Now that your collateral has been eroded so substantially under the Court's 'protection' and my management and control, I am entitled to keep the property under my management and control because I get the benefit of the fact that I now am permitted to pay you less."[6]

There can be no doubt that the first Plan was "substantially consummated"—the property revested in the Debtor; he took out the new loans contemplated in the Plan; he made payments under the Plan; the bank and other parties were conducting themselves in reliance on the Plan. This Court finds that this second filing is an impermissible effort to modify the prior

---

5. The debtor argues, in the briefs, that the *Bouy, Hall* case is the only case that addresses serial filings in a *res judicata* framework of analysis. Apart from the fact that the *Adams* case uses that same framework, there is the fact that the Second Circuit Court of Appeals has declared an order of confirmation to have *res judicata* effect for some purposes. See *In re Maxwell Communication Corp.*, 93 F.3d 1036 (2nd Cir.1996). Consequently, *res judicata* is not an inappropriate framework for analysis.

6. To this writer, there is little qualitative difference between this case and a particular Chapter 13 case that came before the Court in which a debtor who had violated her contract with her car lender by failing to repair the vehicle after a collision for which she was compensated by the other driver's insurer, sought to strip the lender down to the value of the car as a damaged vehicle. This writer ruled that this was an effort to extract too many benefits from the bankruptcy system, and so was not in "good faith." Of course, a family farm is not a car, but if the car is the only way to earn a living, and if the debtor cannot afford to save the car at a "fair value," the two situations are not totally inapposite.

plan to the substantial prejudice of the objecting creditor and without "objective" good faith in the form of "fundamental fairness." In the terms used by the *Bouy, Hall* case, quoted above, this filing is "so related in time [and] in substance to the earlier case that it represents a collateral attack on the initial order of confirmation." *Id.* at 744.

In light of this holding, it is not necessary for the Court to determine whether the various adversities suffered by the debtor were "extraordinary" circumstances or not. It is assumed arguendo that they were extraordinary.

The bank's motion to dismiss this case will be granted in 30 days unless, within 20 days, the Debtor proposes a plan that is "fundamentally fair" and is consistent with the above discussion. The continued evidentiary hearing set for May 1, 2001 is moot.