# FILED

JUL 17 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   NV-11-1620-KiPaD |
| CAVIATA ATTACHED HOMES, LLC, ) | Bk. No.   11-52458-BTB |
| Debtor. ) | |
| CAVIATA ATTACHED HOMES, LLC, ) | |
| Appellant, ) | |
| v. ) | **A M E N D E D** |
| U.S. BANK, NATIONAL ) ASSOCIATION, ) | **O P I N I O N** |
| Appellee. ) | |

Argued and Submitted on June 15, 2012
at Las Vegas, Nevada

Original Opinion Filed - June 29, 2012

Amended Opinion Filed - July 17, 2012

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce T. Beesley, Bankruptcy Judge, Presiding

Appearances:    Jeffrey L. Hartman, Esq. of Hartman & Hartman argued for appellant, Caviata Attached Homes, LLC; Joshua D. Wayser, Esq. of Katten Muchin Rosenman LLP argued for appellee, U.S. Bank, National Association.

Before:  KIRSCHER, PAPPAS, and DUNN, Bankruptcy Judges

KIRSCHER, Bankruptcy Judge:

Appellant, chapter 11[1] debtor Caviata Attached Homes, LLC ("Caviata"), appeals an order from the bankruptcy court dismissing its second chapter 11 case due to Caviata's inability to show that an extraordinary change in circumstances substantially impaired its performance under its confirmed plan to warrant the second chapter 11 filing. In addressing this issue of first impression within the Ninth Circuit, we AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    Prepetition facts.**

Caviata, a Nevada limited liability company, was formed in July 2005 for the purpose of real estate development. The sole owner of Caviata is Caviata 184, LLC, a Nevada limited liability company. William Pennington ("Pennington") and Dane Hillyard ("Hillyard") are Caviata's managers. Caviata owns and operates a 184-unit apartment complex located in Sparks, Nevada (the "Property"). The Property was initially developed by Caviata as a condominium project, but due to downturns in the real estate market, it was converted to rental apartments.

To develop the Property, on or about September 20, 2005, Caviata obtained a construction loan for $40,700,000 on a recourse basis from California National Bank ("CNB"). In exchange for the loan, Caviata executed a promissory note and deed of trust in favor of CNB, which assigned Caviata's right, title and interest

---

[1] Unless specified otherwise, all chapter, code, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

-2-

in the Property, including all rents, income and profits. The parties agreed to an interest rate of prime plus .25% and a maturity date of September 20, 2007. Guarantors on the loan included Caviata 184, LLC, Pennington, and Hillyard.

Caviata defaulted on the loan. On or about April 25, 2007, Caviata and CNB entered into a forbearance agreement whereby CNB agreed to forbear from exercising its rights under the loan documents. The forbearance agreement was thereafter amended six times, with the most recent amendment dated January 15, 2009. In connection with the sixth amendment, Caviata and CNB executed an amended note under which Caviata agreed to pay CNB the remaining principal balance on the note of $27,476,632.88, plus 7% interest, by no later than April 15, 2009.

Caviata again defaulted on the loan, and on April 24, 2009, CNB sued Caviata and the loan guarantors in state court. On October 30, 2009, the FDIC closed CNB, and its assets were assigned to U.S. Bank, N.A. ("U.S. Bank"). Trial against the guarantors was initially set for March 15, 2010. The guarantors filed a motion to continue trial, contending they had no assets to satisfy a judgment.

**B.    Caviata's first chapter 11 case.**

Caviata filed its first chapter 11 bankruptcy petition on August 18, 2009 (Case No. 09-52786). The case was ultimately assigned to the Hon. John L. Peterson, sitting by designation. As of the petition date, U.S. Bank claimed it was owed $29,564,308.77, as reflected in its filed proof of claim. Just prior to Caviata's filing, U.S. Bank had obtained an appraisal on the Property on June 29, 2009, from its appraiser William Kimmel

-3-

(the "June 2009 Appraisal"), which valued the Property at $23,100,000.

Caviata filed its chapter 11 plan and disclosure statement on November 16, 2009, followed by a first amended plan and amendment to Caviata's disclosure statement[2] on January 28, 2010 (the "First Plan").[3] Pursuant to the First Plan, Caviata proposed to pay U.S. Bank 4.25% interest on its allowed secured claim of $27,476,632.88 for three years. After three years, Caviata committed to sell the Property or refinance the loan to pay U.S. Bank in full. If Caviata defaulted under the First Plan, U.S. Bank was entitled to enforce its rights and foreclose. Caviata's approved disclosure statement[4] specifically disclosed the following risks:

> Because the Plan provides for the reorganization of the Debtor as a going concern or sale of the Property, many of the common risk factors found in typical reorganizations apply with respect to the Plan. These include (a) the value of the Debtor's property has suffered significantly as a result of the downturn in the United States economy since the summer of 2007. There is no assurance that the economy will turn around and that property values, in general, or the value of the Debtor's Property, in particular, will not continue

---

[2] This amendment only amended the treatment of CNB's claim and all other aspects of Caviata's disclosure statement remained unchanged.

[3] In November 2009, the parties stipulated that Caviata is a "Single Asset Real Estate" case as defined by § 101(51B). An order to that effect was entered on November 10, 2009.

[4] Caviata's appellate appendix does not include all the documents listed in its Designation of Record. We thereby exercise our discretion to independently review the docket in Caviata's first and second bankruptcy cases, and documents electronically filed therein through the court's CM/ECF system. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989) (appellate court may take judicial notice of underlying bankruptcy records).

-4-

to decline; (b) the Plan is dependent, at least in part, on continued leasing of the Property. There is no assurance that the Debtor'[s] predictions of the rate of stabilizing the Property and achieving performing leases will occur, or that these predictions will occur within the time period projected in the Plan; (c) because the Plan is dependent on continued leasing of the Property, there is a risk that the projections of net operating income, with which to pay the Allowed Claims of Creditors, may not be met; (d) the Debtor may not be able to sell its Property; (e) the Debtor may not be able to secure alternative financing to satisfy the Allowed Secured Claim of Cal National or the Allowed Secured Claim of Specialty Trust; (f) if Cal National is not paid in accordance with the Plan, and the Debtor is unable to sell the Property or to secure alternative financing, Cal National may foreclose on the Property.

Caviata disclosure statement, Case No. 09-52786, Doc. No. 31, § 12.1, pp. 25-26 (Nov. 16, 2009).[5]

U.S. Bank objected to confirmation of the First Plan contending, <u>inter alia</u>, that it was not feasible. In support of its objection, U.S. Bank offered a declaration from Kimmel appraising the Property at $20 million (the "January 2010 Appraisal"). According to Kimmel, although the Property's occupancy rate had increased since June 2009 from 95% to 98%, average rent rates were down. Considering the uncertainty in the market, which Kimmel opined showed no signs of improving in the near future, and the lack of financing, the Property's value was now only $20 million. U.S. Bank argued that Caviata failed to submit any evidence showing its ability to sell or refinance the Property in the next three years in order to pay off the note. In fact, argued U.S. Bank, although Pennington asserted that Caviata could sell the Property for $34 million in three years, Pennington

---

[5] Caviata's unapproved disclosure statement filed in its second bankruptcy case contained the same provision in § 12.1, p. 16, except it amended the creditor's name from "Cal National" to "U.S. Bank".

-5-

and Hillyard had admitted they had not marketed the Property to test its worth or sought any refinancing. U.S. Bank further objected to Caviata's proposed 4.25% interest rate, contending that its expert, Richard Zelle ("Zelle"), who also brokers commercial real estate loans, believed no efficient market existed for a loan on the Property and that 9.25% was a more appropriate rate.

The bankruptcy court held a confirmation hearing on the First Plan on March 3, 2010. Pennington, who has over thirty years experience in large-scale real estate development in Northern Nevada, testified that he agreed with the June 2009 Appraisal valuing the Property at $23,100,000; however, he believed the Property would be worth $34 million within the next couple of years because of its desirability and uniqueness in the market. Hr'g Tr., Mar. 3, 2010, 21:7-24:7. When asked why Caviata was unwilling to sell the Property now, Pennington responded that the current economic situation was unlike anything he had ever seen before, and a sale now would fail to realize a maximum return on the Property. Based on his experience, Pennington believed that conditions were going to improve. Id. at 25:12-27:11. On cross-examination, Pennington admitted that he had not tried marketing the Property or obtaining refinancing because that was not part of his business plan, at least not yet. Id. at 33:18-35:17.

Caviata's interest rate expert, Dr. Christopher Wazzan ("Dr. Wazzan"), admitted that no loan market existed for a debtor like Caviata. Nonetheless, he believed a fixed rate of 4.75% was an appropriate interest rate for U.S. Bank's secured claim and that the First Plan was feasible at that rate. Id. at 76-93. Dr.

-6-

Wazzan further testified that although forecasting was difficult, the empirical data showed that things were improving. Id. at 93:25-94:7.

Appraiser Kimmel then testified about his January 2010 Appraisal, to which Caviata's counsel objected because Kimmel had not disclosed a new report on which he based his testimony. Hr'g Tr., Mar. 3, 2010, 115-24. The court noted the objection for the record. Id. at 124:18-21. Kimmel explained that the January 2010 Appraisal for $20 million was consistent with testimony he gave in January 2010 after reviewing Caviata's income and expense statements from that time period. Id. at 125. Kimmel disagreed with Pennington's and Dr. Wazzan's opinion that the market was improving in the Reno/Sparks area. He believed it had declined since June 2009 because financing had become more difficult to obtain, and buyers were not willing to pay the prices they were before due to larger down payment requirements. Id. at 126:1-127:12. On cross-examination, Kimmel admitted that the Reno/Sparks apartment market was "getting better and the rents now [were] starting to creep up again." Id. at 146:21-147:8.

Interest rate expert Zelle testified that Caviata's plan to payoff U.S. Bank in three years was "a dream" and "a fairy tale," and for Caviata to pay $23 million or $29 million to U.S. Bank the "property [was] going to have to become Disneyland in Reno." Id. at 169:12, 170:17-21. When asked about whether the market would improve, Zelle testified that selling in three years was a risk factor he considered because he did not see it happening. Id. at 171:7-22. Zelle further concluded that the First Plan was not feasible because Caviata could not make the monthly payments or

-7-

the balloon payment. Id. at 190:18-191:14. Zelle admitted he had not provided any analysis as to why Caviata could not make the balloon payment in three years. Id. at 191:15-18.

The bankruptcy court ordered post-hearing briefing on certain issues. U.S. Bank's supplemental brief asserted essentially the same feasibility objection, contending that "the Plan [was] a mere hope and prayer of the Debtor to pay off some of its debts." U.S. Bank argued that a sale price of $34 million for the Property, even if realized in three years, would not cover its claim, which was already over $32 million,[6] let alone the junior lender's claim, which was over $6 million.

On April 12, 2010, the bankruptcy court entered its Memorandum Decision, Findings of Fact and Conclusions of Law and Order overruling U.S. Bank's objections and confirming the First Plan. The court rejected U.S. Bank's tardy amended proof of claim, determining that it improperly included the accrual of postpetition interest in violation of United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988), as well as unreasonable (and unrequested) attorney's fees. The court also rejected Kimmel's January 2010 Appraisal as a "devious tactic" by U.S. Bank to increase the amount of its unsecured claim in order to defeat Class 4 acceptance of the First Plan, and it struck it from the record as an improper report prejudicial to Caviata because it contained no supporting data, exhibits, or basis for its $20 million value. Mem. Dec., Apr. 12, 2010, Doc. No. 152 pp. 8-9. The court found that what data it did provide was

---

[6] On March 12, 2010, U.S. Bank filed an amended proof of claim for $32,801,217.95.

-8-

contradicted by other data within the declaration and/or Kimmel's testimony at the confirmation hearing. Accordingly, the court accepted Kimmel's June 2009 Appraisal of the Property for $23,100,000, which Caviata had accepted as its own, and determined that U.S. Bank held a secured claim in that amount.

As for the interest rate on the secured portion of U.S. Bank's claim, the bankruptcy court found Dr. Wazzan's testimony credible and consistent with Till v. SCS Credit Corp., 541 U.S. 465 (2004). The court found Zelle's approach flawed and not credible because it resulted in a negative LTV ratio due to failing to bifurcate U.S. Bank's claim. The court further found that Zelle's "coerced" loan approach had been rejected in Till. As a result, Dr. Wazzan's proposed interest rate of 4.75% applied.

Finally, as to feasibility, the bankruptcy court found Pennington's testimony credible that Caviata should be able to sell the Property for at least $34 million within three years, when the cycle of downturn would improve.[7]

Per the First Plan, Caviata began making monthly payments of $120,500.53 to U.S. Bank in June 2010. To date, Caviata's plan payments are current.

**C. Caviata's second chapter 11 case.**

Approximately fifteen months after confirming the First Plan

---

[7] U.S. Bank appealed the confirmation order on several grounds, including the bankruptcy court's finding that the First Plan was feasible. While the appeal was pending, Caviata filed an objection to U.S. Bank's claim. The parties eventually entered into a stipulation resolving the appeal and claim objection and agreed that U.S. Bank would have a claim of $29,564,308.77 against Caviata. The order approving the stipulation was entered on January 12, 2011. The appeal of the confirmation order was dismissed on January 24, 2011.

-9-

and almost two years after its first chapter 11 filing, Caviata filed its second chapter 11 case on August 1, 2011 (Case No. 11-52458). Caviata valued the Property at $23,420,928 in its schedules filed on August 23, 2011. U.S. Bank's appraiser, Scott Beebe, conducted an appraisal of the Property as of August 23, 2011, and he asserted that the Property's value had decreased to $20,900,000.

On September 9, 2011, U.S. Bank moved to dismiss Caviata's second bankruptcy case. In short, U.S. Bank contended the second filing was a bad faith filing and a backdoor attempt to circumvent the prohibition on modifying a substantially consummated plan under § 1127. While acknowledging that some courts have created a limited "good faith" exception to this prohibition, U.S. Bank contended that Caviata failed to demonstrate that an extraordinary change in circumstances occurred after substantial consummation of the First Plan, which substantially impaired its performance under the First Plan. U.S. Bank argued that "extraordinary circumstances" did not include decreased income, increased expenses, or reasonably foreseeable changes in debtor's operations, the market or the economy. U.S. Bank noted that in Caviata's first quarter report filed on April 25, 2011, Caviata represented that it did not foresee any circumstances that would affect its ability to perform under the First Plan. A hearing on the motion to dismiss was set for October 7, 2011.

Caviata opposed dismissal, contending that substantial and fundamental changes had seriously impacted the finance and real estate markets beyond any level that could have been foreseen, and, at the time of confirmation, Caviata did not and could not

-10-

have known that recovery from the 2007-2009 recession would not occur as predicted, but, rather, the economy would suffer a relapse. Although it was not yet in default under the First Plan, Caviata contended that modifications were necessary or it would be unable to fully perform its confirmed plan. Caviata acknowledged that while courts have typically determined that changed market conditions alone are insufficient to warrant a second chapter 11 filing, such cases were based upon "general" market fluctuations, not the global economic crisis the world was currently experiencing. Notwithstanding these cases, argued Caviata, courts have allowed a second filing when an "unforeseeable" economic change fundamentally changes market conditions, citing Lincoln Nat'l Life Ins. Co. v. Bouy, Hall & Howard and Assocs. (In re Bouy, Hall & Howard and Assocs.), 208 B.R. 737, 745 (Bankr. S.D. Ga. 1995) [hereinafter "Bouy Hall"]. Because Caviata believed this matter involved highly disputed factual issues requiring evidentiary support and expert testimony, it asked the court to set an evidentiary hearing.

In support of its opposition, Caviata offered the declaration of banking expert Tod Little ("Little"), who was retained to opine on the state of the country's economy as of March 3, 2010 --- the First Plan confirmation hearing date. Little offered his declaration in lieu of a forthcoming report he claimed would support his testimony at a future evidentiary hearing on U.S. Bank's motion. According to Little, no one, including Caviata, could have predicted at the time of confirmation of the First Plan in 2010 that a relapse in the recession not seen since the Great Depression of the 1930s would occur, or that it would

-11-

continue for such an extended period of time. Typically, asserted Little, national economic recessions cycle and recover within 10-22 months, with the average duration being 18 months. Little claimed that significant, unforeseen national economic changes during the past eighteen months seriously impacted Caviata's ability to fully perform the First Plan. These events included:

● The U.S. experienced an economic recession during 2007-2009 which significantly impacted the residential and commercial real estate markets causing real estate values to plummet, banks to collapse, and lending to become non-existent;

● In late 2009/early 2010 the federal government adopted numerous reforms, instituted stimulus programs and created incentives for banks and lending institutions;

● In early 2010, prominent national economists, including Fortune 500 CEOs and the chairman of the federal reserve, and even President Obama, were touting that our economy had "hit bottom" and could only improve;

● The European banking system meltdown compounded the U.S. Banking crisis;

● A market for new loans or refinancing of existing loans still did not exist due to few active lenders and stricter underwriting guidelines, and no resolution to the banking system problem would be achieved anytime soon;

● FDIC policy changes, which caused lenders to benefit more from foreclosure than working out agreements with borrowers, added to the disruption of the normal economic relationship between borrowers and banks.

In further support of its opposition, Caviata also offered a declaration from Pennington. Pennington stated that he had contacted no less than five lenders seeking refinancing of Caviata's existing loan on the Property, but all five had advised him that no financing was available due to the credit markets and the restrictions placed on banks by the FDIC. The lenders also advised Pennington that until the economy recovered, the chances

-12-

of Caviata obtaining a new loan or refinancing for the Property were nonexistent. Pennington further represented that he was also seeking to sell the Property for $32,400,000, but was told by several brokers that until the credit markets opened up to buyers of multi-residential properties, it was highly doubtful the Property would sell. Finally, Pennington stated that because of the representations by President Obama and the nation's leading economists in early 2010 that the recession had ended and had entered a state of recovery, he believed the First Plan's three-year term was reasonable at the time of confirmation, and he could not have foreseen the changes articulated by Little that occurred after confirmation of the First Plan.[8]

Caviata filed a proposed second plan and disclosure statement on September 27, 2011, which extended the time within which it was required to sell or refinance the Property from three years to ten years, reduced the amount paid to U.S. Bank from $29,564,308.77 to $22,420,928.00, and reduced the interest rate on U.S. Bank's secured claim from 4.75 to 4.00%.

In its reply, U.S. Bank contended that from the beginning of the first bankruptcy case its experts had warned Caviata that the First Plan was a pipe dream, but, instead of heeding these warnings, Caviata essentially stuck its head in the sand and went forward with its First Plan. According to U.S. Bank, Caviata's opposition failed to explain how a recession that was present

---

[8] Caviata had also intended to submit a declaration from real estate expert Reese Perkins ("Perkins") concerning the local market and how values had been impacted by the unforeseen changed circumstances occurring since early 2010, but Perkins was out of town and unavailable until just days before the dismissal hearing.

-13-

during the first bankruptcy case and was still present during the second bankruptcy case was "unforeseeable," or how it was a "changed" market condition when the market was just as bad now as it was then.  U.S. Bank further argued that mere opinion of public figures on the improved state of the economy in early 2010 was not evidence that the recession was an unforeseeable circumstance or a changed market condition.  U.S. Bank opposed an evidentiary hearing as a waste of the court's time; it was common knowledge that the economy was bad in both 2010 and 2011.

The hearing on U.S. Bank's motion to dismiss took place on October 7, 2011, before the Hon. Bruce T. Beesley.  Before hearing oral argument, the bankruptcy court recited a brief history of Caviata's first bankruptcy case and noted that the First Plan had been ongoing for about "10 months."  Hr'g Tr., Oct. 7, 2011, 2:8-19.  Caviata's counsel confirmed the court's version of the facts.  Id. at 2:20.  The court then noted that it had considered the pleadings, declarations, attachments, and parts of the First Plan and proposed second plan.  It summarized the parties' positions regarding the First Plan and then posed the following question to Caviata:

> So I have difficulty understanding how this is a surprise to the debtor as a basis for filing a new . . . Chapter 11 while the existing Chapter 11 is pending because you have to show as I understand it some significant change in circumstances that wasn't anticipated. And I guess -- my question is and what I have real problems with is I can't see given the objection by the secured party how they can say that their -- we had no inkling that this was going to happen because they were fighting with somebody who says exactly what has happened did happen. It's very difficult for me to understand how that can be a surprise, but I'm happy to hear from you.

Id. at 5:4-17.  Caviata's counsel began by noting that an

-14-

evidentiary hearing was necessary because not all of the facts were set forth in the declarations. The court responded by asking counsel for an offer of proof as to what facts he would present if an evidentiary hearing were granted. Counsel stated that although he had not yet obtained a declaration from Perkins, Little and Pennington would testify that the economy taking such a turn for the worse was an unforeseeable event, and it fundamentally changed the real estate market by eliminating funding for new loans. Id. at 6:11-8:12.

Caviata's counsel and the court then engaged in a lengthy colloquy about Bouy Hall. Id. at 8:12-9:25. When the court opined that loans were also not available when the First Plan was confirmed in April 2010, counsel responded that no evidence had been presented at that time about the possibility of a recession of this magnitude, and no such evidence could have been presented because no one knew or thought it could happen. Had there been any such evidence, argued counsel, the First Plan would not have been confirmed. Counsel further noted that although U.S. Bank disputed the First Plan's feasibility, its experts had never opined that the real estate market would collapse or that no funding would be available during the First Plan's term.

U.S. Bank contended that during the proceedings culminating in confirmation of the First Plan, it had articulated doubts about the Property appreciating in three years to a value sufficient to pay off its claim. U.S. Bank further argued that the fact the loan market was currently tight was not a new fact supporting the extraordinary change required for filing a second case; the market was also tight in 2010 and everyone knew it. Finally, U.S. Bank

-15-

argued that an evidentiary hearing was not necessary for a motion to dismiss.

After hearing further argument from the parties, the bankruptcy court orally granted U.S. Bank's motion to dismiss. The court again noted that it had reviewed the pleadings, declarations, a number of cases including Bouy Hall, and § 1141. Hr'g Tr., Oct. 7, 2011, 25:11-14. It then entered its findings and conclusions on the record:

> [A] plan of reorganization which is confirmed is a contract between two parties. It's between the secured lender here and the debtors, and the fact that the economy changes doesn't relieve people from their contractual obligations. If I have purchased a car and because of the economy I lose my job, I don't get to go back to the person who financed my car and say I want to do this over because I don't have enough money.
>
> I think the economy is terrible, but I think that in 2010 there were certainly inklings that the economy was very bad. It was only 10 months ago and the situation has not deteriorated that badly in the last 10 months. It's been awful. The debtor when they made their plan basically said, you know, our best guess that we can get confirmed is we think we can get this done in three years. They were just wrong. And I'm not saying that's a bad faith issue in this case, but I don't think just being wrong that the economy is worse than they thought it was going to be is a basis for filing a new plan.

Id. at 25:15-26:8. As a result of the dismissal, Caviata was still operating under the First Plan. Caviata's request for an evidentiary hearing was denied. Id. at 26:19-22.

The bankruptcy court entered an order granting U.S. Bank's motion to dismiss Caviata's second chapter 11 case on October 27, 2011. Caviata timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(A) and 1334. We have jurisdiction under 28 U.S.C.

§ 158.

## III. ISSUES

1.   Did the bankruptcy court abuse its discretion when it denied Caviata's request for an evidentiary hearing?

2.   Did the bankruptcy court abuse its discretion in dismissing Caviata's second chapter 11 case?

## IV. STANDARDS OF REVIEW

We review for an abuse of discretion the bankruptcy court's decision not to conduct an evidentiary hearing. Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.), 503 F.3d 933, 939 (9th Cir. 2007).

We review the bankruptcy court's decision to dismiss a case for abuse of discretion. Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1223 (9th Cir. 1999).

In applying the abuse of discretion standard, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If it applied the correct legal rule, we then review the bankruptcy court's fact findings for clear error. Id. at 1262 & n.20. We must affirm the bankruptcy court's fact findings unless we conclude that they are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id. at 1262.

We may affirm on any basis supported by the record. Pac. Capital Bancorp, N.A. v. E. Airport Dev., LLC (In re E. Airport Dev., LLC), 443 B.R. 823, 828 (9th Cir. BAP 2011).

-17-

# V. DISCUSSION

**A.    The bankruptcy court did not abuse its discretion when it denied Caviata's request for an evidentiary hearing.**

Caviata asserts that it requested an evidentiary hearing to show: (1) extraordinary changed circumstances occurred in the economy and market (other than a general decline) that warranted its second chapter 11 filing; and (2) that the extraordinary changed circumstances were unforeseeable to Caviata.  Caviata argues that because a factual dispute between the parties existed on these issues, the bankruptcy court was required to provide procedures and schedule an evidentiary hearing on the matter. Caviata argues that, because the bankruptcy court weighed the evidence before it knowing that the record was incomplete and yet made its determination to dismiss the second chapter 11 filing, the court violated Caviata's due process rights and severely prejudiced Caviata by not allowing it to present its entire case. We disagree.

U.S. Bank's motion to dismiss is a contested matter subject to Rule 9014.  See Rule 1017(f)(1).  A contested matter hearing under Rule 9014,[9] as amended in 2002, "ordinarily requires trial testimony in open court with respect to disputed material factual issues in the same manner as an adversary proceeding." Khachikyan v. Hahn (In re Khachikyan), 335 B.R. 121, 126 (9th Cir. BAP 2005). The advisory committee's note provides:

---

[9] Rule 9014(d) provides:

    (d) Testimony of witnesses.  Testimony of witnesses with respect to disputed material factual issues shall be taken in the same manner as testimony in an adversary proceeding.

-18-

> Subdivision (d) is added to clarify that if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held at which testimony of witnesses is taken in the same manner as testimony is taken in an adversary proceeding or at a trial in a district court civil case. Rule 43(a), rather than Rule 43(e)[now 43(c)], F.R.Civ.P., would govern the evidentiary hearing on the factual dispute. Under Rule 9017, the Federal Rules of Evidence also apply in a contested matter. Nothing in the rule prohibits a court from resolving any matter that is submitted on affidavits by agreement of the parties.

Rule 9014(d), Advisory Comm. Note to 2002 amendments. Consequently, through Rule 9017, such testimonial evidence is taken pursuant to Civil Rule 43(a), unless the parties agree to submit the contested matter on affidavits. Such agreement to use affidavits did not exist between the parties in this case. If a court determines that no "disputed material factual issues" exist, it may then hear a motion on affidavits, oral testimony or depositions when the motion relies on facts outside the record. See Civil Rule 43(c) incorporated by Rule 9017.

Section 1112(b) provides for the dismissal of a debtor's case for cause "after notice and a hearing." "Notice and a hearing" is defined in § 102(1)(A) to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances[,]" subject to the discretionary limitation imposed by Rule 9014(d). The bankruptcy court specifically noted its partial review of the record in the first bankruptcy case in conjunction with the affidavits submitted in the second case.

Caviata's approved disclosure statement in the first case identified through its designated risks the factual issues that Caviata now argues were unforeseen at the time of confirmation in

-19-

the first case. Caviata specifically disclosed in § 12.1:

> (a) the value of the Debtor's property has suffered significantly as a result of the downturn in the United States economy since the summer of 2007. There is no assurance that the economy will turn around and that property values, in general, or the value of the Debtor's Property, in particular, will not continue to decline; (b) the Plan is dependent, at least in part, on continued leasing of the Property. There is no assurance that the Debtor'[s] predictions of the rate of stabilizing the Property and achieving performing leases will occur, or that these predictions will occur within the time period projected in the Plan; (c) because the Plan is dependent on continued leasing of the Property, there is a risk that the projections of net operating income, with which to pay the Allowed Claims of Creditors, may not be met; (d) the Debtor may not be able to sell its Property; (e) the Debtor may not be able to secure alternative financing to satisfy the Allowed Secured Claim of Cal National or the Allowed Secured Claim of Specialty Trust; (f) if Cal National is not paid in accordance with the Plan, and the Debtor is unable to sell the Property or to secure alternative financing, Cal National may foreclose on the Property.

At the confirmation hearing on March 3, 2010, U.S. Bank also raised issues through its expert, William G. Kimmel, concerning the ability to refinance, Hr'g Tr., Mar. 3, 2010, 126:20-127:6, the poor global economic situation, id. 146:15-19, and the status of the housing market, id. 126:15-19.

In the second case, Caviata submitted declarations from Little and Pennington in support of its opposition to U.S. Bank's motion to dismiss. The bankruptcy court considered these declarations. The court went one step further and asked Caviata's counsel for an offer of proof. Counsel stated that although he had not yet obtained a declaration from Perkins, Little and Pennington would testify that the worsening economy from 2010 to 2011 was an unforeseeable event, and that it fundamentally changed the real estate market by eliminating funding for new loans.

Caviata set forth similar disclosures in the approved

-20-

disclosure statement filed in the first case. Additionally, U.S. Bank provided such evidence during the confirmation hearing in the first case. The material facts before the bankruptcy court in the second case were not disputed. Such evidence already existed in the record from the first case and was not disputed in the second case. Any economic changes alleged by Caviata were foreseeable, as affirmed by the evidence submitted by U.S. Bank in both the first and second cases and by Caviata in its approved disclosure statement in the first case. Consequently the factual issues were not disputed as required under Rule 9014(d). "Where the . . . core facts are not disputed, the bankruptcy court is authorized to determine contested matters . . . on the pleadings and arguments of the parties, drawing necessary inferences from the record." Tyner v. Nicholson (In re Nicholson), 435 B.R. 622, 636 (9th Cir. BAP 2010) (quoting Gonzalez-Ruiz v. Doral Fin. Corp. (In re Gonzalez-Ruiz), 341 B.R 371, 381 (1st Cir. BAP 2006)). We conclude the bankruptcy court had sufficient undisputed evidence before it to issue its ruling without any further evidentiary hearing and did not abuse its discretion in denying the request for an evidentiary hearing. In re Int'l Fibercom, Inc., 503 F.3d at 939; Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1139 (9th Cir. 2004).

**B.    The bankruptcy court did not abuse its discretion in dismissing Caviata's second chapter 11 case.**

Under § 1141(a), the terms of a confirmed plan are binding on all parties. Section 1127(b) provides that a chapter 11 plan may be modified before but not after "substantial consummation" of the

-21-

plan.[10]  Taken together, "§§ 1127(b) and 1141(a) impose an important element of finality in chapter 11 proceedings, allowing parties to rely on the provisions of a confirmed reorganization plan."  Integon Life Ins. Corp. v. Mableton-Booper Assocs. (In re Mableton-Booper Assocs.), 127 B.R. 941, 943 (Bankr. N.D. Ga. 1991).

Although § 1127(b) prohibits modification of a substantially consummated plan, several courts have held that serial chapter 11 filings are not per se impermissible, and that a second plan may modify the first plan where there has been an unforeseeable or unanticipated change in circumstances.  See Elmwood Dev. Co. v. Gen. Electric Pension Trust (In re Elmwood Dev. Co.), 964 F.2d 508, 511-12 (5th Cir. 1992) ("[A] second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief.") (citing Johnson v. Home State Bank, 501 U.S. 78 (1991)); PNC Mortg. v. Deed & Note Traders, LLC (In re Deed & Note Traders, LLC), 2012 WL 1191891, at *6-7 (9th Cir. BAP Apr. 5, 2012); In re Woods, 2011 WL 841270, at *3-4 (Bankr. D. Kan. Mar. 7, 2011); In re 1633 Broadway Mars Rest. Corp., 388 B.R. 490, 500 (Bankr.

[10] "Substantial consumption" is defined in § 1101(2) as:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
(C) commencement of distribution under the plan.

The parties do not dispute that the First Plan has been substantially consummated.

-22-

S.D.N.Y. 2008); In re Motel Props., Inc., 314 B.R. 889, 895-96 (Bankr. S.D. Ga. 2004); In re Tillotson, 266 B.R. 565, 569 (Bankr. W.D.N.Y. 2001); In re Adams, 218 B.R. 597, 601-02 (Bankr. D. Kan. 1998); In re Northtown Realty, Co., 215 B.R. 906, 913 (Bankr. E.D.N.Y. 1998); In re Woodson, 213 B.R. 404, 405-06 (Bankr. M.D. Fla. 1997); Bouy Hall, 208 B.R. at 743-44; In re Del. Valley Broadcasters L.P., 166 B.R. 36, 40 (Bankr. D. Del. 1994); In re Roxy Real Estate Co., 170 B.R. 571, 576 (Bankr. E.D. Penn. 1993); In re Mableton-Booper Assocs., 127 B.R. at 943-44 ("Where unexpected circumstances doom the debtor's chances for success, binding the parties to the original confirmation decision in the name of finality would frustrate [the goal of reorganization], and the confirmation decision should be reevaluated."); In re Casa Loma Assocs., 122 B.R. 814, 817-18 (Bankr. N.D. Ga. 1991).[11] However, "[e]ven extraordinary and unforeseeable changes will not support a new Chapter 11, if these changes do not substantially impair the debtor's performance under the confirmed plan." In re Adams, 218 B.R. at 602; see also In re Woods, 2011 WL 841270, at *4. Thus, for the bankruptcy court to consider a debtor's second chapter 11 filing and plan, the unforeseeable or unanticipated change in circumstances must have affected the debtor's ability to fully perform under its confirmed plan. In re Woods, 2011 WL 841270, at *4; In re Adams, 218 B.R. at 602; In re Northtown Realty, Co., 215 B.R. at 913; In re Woodson, 213 B.R. at 405; In

---

[11] The Seventh Circuit in Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.), 886 F.2d 859 (7th Cir. 1989), held that serial bankruptcy filings are not per se impermissible, but it did not expressly discuss unforeseen or unanticipated changed circumstances as a basis for a serial filing.

re Roxy Real Estate, 170 B.R. at 576; In re Casa Loma Assocs., 122 B.R. at 818. Examples of unforeseen changed circumstances in the above cases include a change in federal law affecting tenancy of an apartment building, termination of service by major airlines which had provided vital customers for an airport hotel, lost crops due to hail, cattle and pasture lost due to fire, and substantial adverse judgments.

In cases of economic change, courts have held generally that changed market conditions alone are insufficient to warrant a second chapter 11 filing. In re Elmwood Dev. Co., 964 F.2d at 512-13 (event of national "credit crunch" in early 1990's might be a changed circumstance justifying a second chapter 11 filing but appellate court upheld bankruptcy court's decision to reject it); In re 1633 Broadway Mars Rest. Corp., 388 B.R. at 502 n.17 (recession of late 2007 was a change in general economic condition and insufficient basis for second chapter 11 filing); In re Motel Props., Inc., 314 B.R. at 896 (foreseeable risk of operating any business is the fluctuation in supply and demand and its impact on the market); In re Tillotson, 266 B.R. at 569 (changes associated with realities of economic change are an insufficient reason to allow second chapter 11 filing); In re Adams, 218 B.R. at 602 (same); In re Northtown Realty Co., 215 B.R. at 913; Bouy Hall, 208 B.R. at 745; In re Roxy Real Estate Co., 170 B.R. at 576 (a change in market condition for rental properties or real estate is insufficient changed circumstance); In re Mableton-Booper Assocs., 127 B.R. at 944; In re Casa Loma Assocs., 122 B.R. at 818.

However, "where a debtor experiences a 'fundamental change in its market' and not the typical fluctuations of supply and demand,

if unforeseeable, the change may represent sufficiently changed circumstances to warrant a second filing." Bouy Hall, 208 B.R. at 745; In re Motel Props., Inc., 314 B.R. at 896 (second filing permitted when an unforeseeable economic event fundamentally changes the market conditions). "When an unforeseeable economic change effects a significant change in the market, a second filing may be permitted." Bouy Hall, 208 B.R. at 745 (emphasis in original).

Cases in which a chapter 11 debtor has been successful at showing unforeseen changed circumstances to warrant a second chapter 11 filing are clearly the exception rather than the rule. Bouy Hall and In re Casa Loma Associates are two of those rare exceptions. In Bouy Hall, after the debtor had confirmed and substantially consummated its chapter 11 plan, the debtor's hotel business was damaged when a nearby airport which supplied much of the hotel's customer base relocated its terminal to a location further away. Id. at 740. In addition, two major airlines eliminated their service into the airport and another airline had filed a chapter 7 bankruptcy, further eroding the debtor's customer market. Id. Based upon this showing, the bankruptcy court overruled the creditor's argument that debtor's problems were either foreseeable or purely economic and denied its motion to dismiss the debtor's second chapter 11 case. Id. at 746. According to the court, the debtor had not only demonstrated that the demand for its service decreased, but also that the market itself had been significantly altered. Id. at 745.

In In re Casa Loma Associates, the bankruptcy court held that an unanticipated change in federal law prohibiting "adults only"

apartment complexes, which severely affected debtor's tenancy rates, and discovery of fire damage and structural defects in an apartment building, which were unknown at the time of plan confirmation, were changed circumstances warranting the second chapter 11 filing. 122 B.R. at 818-19. Accordingly, dismissal of debtor's second chapter 11 case was denied. Id. at 819. The bankruptcy court did note, however, that the result would have been different had the debtor relied merely on changed market conditions to support the second filing. Id. at 818.

Caviata asserts that fundamental and significant changes in the national and local economy have taken place since it confirmed the First Plan, which were not only unforeseeable, but seriously impacted its ability to fully perform the First Plan. Caviata argues that the bankruptcy court ignored the case law and failed to consider whether the change in the economy was a general market decline, as opposed to a fundamental economic change effecting a significant change in the market. We disagree.

In reviewing the statements made by the bankruptcy court at the dismissal hearing, it is clear that it considered the relevant, although not binding, case law, and that it recognized what extraordinary circumstances Caviata needed to show to permit the second chapter 11 filing. The court noted that it had reviewed Bouy Hall and several other cases, and it even discussed some of the facts in Bouy Hall on the record. The court also warned Caviata at the beginning of the hearing that the alleged changed circumstances were not unforeseeable based on U.S. Bank's objections to the First Plan. While agreeing that the current economy is "terrible," the bankruptcy court concluded Caviata had

-26-

not shown that at the time of confirmation of the First Plan it was unforeseeable that the economy would remain depressed and not improve as Caviata had predicted.

Caviata also argues that the bankruptcy court's findings are not supported by the record and are contrary to the evidence presented. Specifically, Caviata contends the bankruptcy court failed to consider its evidence that significant changes occurred after confirmation of the First Plan that could not have been foreseen by Caviata. We now review the evidence presented in this case to see if it supports the bankruptcy court's decision.

In U.S. Bank's objection to confirmation of the First Plan, Kimmel opined in his declaration that because the real estate market showed no signs of improving in the near future and because financing was unavailable, he believed the Property's value was now only $20 million, down from his previous June 2009 Appraisal of $23,100,000. However, the bankruptcy court struck Kimmel's declaration from the record. Nonetheless, Kimmel testified at the confirmation hearing in March 2010 that since June 2009, financing had become more difficult to obtain, and buyers were not willing to pay the prices they were before due to larger down payment requirements. However, on cross-examination, Kimmel admitted that the apartment market in Reno/Sparks was getting better. Interest rate expert Zelle testified that Caviata's plan to payoff U.S. Bank in three years was "a dream" and "a fairy tale," and that the Property would have to become "Disneyland in Reno" in order to pull it off. The bankruptcy court rejected Zelle's "coerced" loan approached to support his 9.25% interest rate. However, Zelle, who brokers commercial real estate loans, also

-27-

testified at the confirmation hearing that he did not see the real estate market improving in three years as Caviata predicted.

In support of the First Plan, Caviata offered the testimony of interest rate expert, Dr. Wazzan, and Caviata's manager, Pennington. Dr. Wazzan testified at the confirmation hearing that although forecasting was difficult, the empirical data showed that things were improving. Pennington, with his thirty-plus years of experience in large-scale real estate development in Northern Nevada, testified that he believed conditions would improve and the Property, which was worth $23,100,000 at the time of confirmation, would be worth $34 million within the next couple of years because of its desirability and uniqueness in the market. Pennington offered no further details as to why he thought the Property's value would appreciate to such a degree in a rather short period of time.

In support of its motion to dismiss Caviata's second chapter 11 case, U.S. Bank did not offer any direct evidence, but it did ask the bankruptcy court to take judicial notice of Caviata's first quarter report filed on April 25, 2011. In that report, Caviata represented that it did not foresee any circumstances that would affect its ability to perform under the First Plan. Arguably, some (if not all) of the catastrophic events Little described had occurred by then, yet Caviata did not foresee any problems fully consummating the Plan in April 2011, which was approximately four months before the second filing.

In its opposition to dismissal, Caviata offered the Little and Pennington declarations. Little articulated a laundry list of events occurring after confirmation of the First Plan that he

opined no one, including Caviata, could have predicted at the time of confirmation of the First Plan in 2010, which warranted the second chapter 11 filing. Pennington stated that, because of the representations by President Obama and the nation's leading economists in early 2010 that the recession had ended and had entered a state of recovery, he believed the First Plan's three-year term was reasonable at the time of confirmation. Pennington asserted that he could not have foreseen the changes articulated by Little that occurred post-confirmation. Notably, during his testimony at the confirmation hearing on the First Plan, Pennington never stated that his belief that the market would improve or that the Property would be worth $34 million in the next couple of years was based on these early 2010 representations by national figures. Pennington also stated that he contacted several lenders seeking refinancing of Caviata's existing loan on the Property, and all had advised him that no financing was available due to the credit market and the restrictions placed on banks by the FDIC. Pennington did not offer any loan application documents or declarations from these lenders in the record. He also did not offer any declarations from the several brokers he claimed he spoke to about listing the Property for sale.

Not finding the testimony offered by Little and Pennington persuasive, the bankruptcy court found that a decline in the economy between 2010 and 2011 was not an unforeseeable and changed circumstance justifying Caviata's second chapter 11 filing.[12]

---

[12] The bankruptcy court also found that Caviata's second chapter 11 filing was not in bad faith, a necessary element for a
(continued...)

-29-

Caviata in its approved disclosure statement from the first case specifically highlighted that risk. We cannot conclude, on this record, that the bankruptcy court's findings are illogical, implausible, or without support in inferences that may be drawn from the facts in the record. Hinkson, 585 F.3d at 1262. Although it may be that no one could have anticipated the precipitous decline in the economy that occurred in 2008, in late 2009/early 2010, when Caviata filed and sought confirmation of the First Plan, the real estate market in many parts of the country, including Northern Nevada, was still depressed. Even Little testified that the lending market at that time was "nonexistent." Some people believed in early 2010 that the economy was recovering; some believed that recovery was still to be seen. As the bankruptcy court put it, Caviata took its "best guess" that things would only get better in the next three years, but it guessed wrong. Even if the economic changes from 2010 to 2011 were as catastrophic as Little indicated, it was not unforeseeable that the real estate and lending markets would not recover as soon as some, including Caviata, had thought especially given Caviata's disclosure of risks and facts in its approved disclosure

---

[12](...continued)
successful second chapter 11 filing. In re Elmwood Dev. Co., 964 F.2d at 511-12; In re Jartran, Inc., 886 F.2d. at 866-67; In re Deed & Note Traders, LLC, 2012 WL 1191891, at *7; In re 1633 Broadway Mars Rest. Corp., 388 B.R. at 500; In re Motel Props., Inc., 314 B.R. at 896; In re Tillotson, 266 B.R. at 569; In re Adams, 218 B.R. at 601-02; In re Northtown Realty, Co., 215 B.R. at 913; In re Woodson, 213 B.R. at 405-06; Bouy Hall, 208 B.R. at 744; In re Del. Valley Broadcasters L.P., 166 B.R. at 40; In re Roxy Real Estate Co., 170 B.R. at 576; In re Mableton-Booper Assocs., 127 B.R. at 943-44; In re Casa Loma Assocs., 122 B.R. at 817-18. U.S. Bank does not dispute this finding, so we need not elaborate on the point.

statement.

Upon the request of a party in interest, the bankruptcy court may dismiss or convert a chapter 11 case for "cause." § 1112(b). Here, the "cause" relied upon by U.S. Bank and found by the bankruptcy court was Caviata's inability to show an extraordinary change in circumstances which substantially impaired its performance under the First Plan to warrant the second chapter 11 filing. Because the bankruptcy court applied the correct legal standard, and its factual findings are not illogical, implausible, or without support in the record, we conclude that it did not abuse its discretion in dismissing Caviata's second chapter 11 case. Accordingly, Caviata is still operating under the First Plan.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

-31-